**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 19 2005**

**PATRICK FISHER**
**Clerk**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JAMES RICCARDI,

      Defendant-Appellant.

No. 03-3132

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 2:02-CR-20060-JWL)**

James R. Wyrsch, Wyrsch Hobbs & Mirakian, P.C. (J. Justin Johnston, Wyrsch Hobbs & Mirakian, P.C., with him on the briefs), Kansas City, Missouri, for Defendant-Appellant.

Kim M. Berger, Assistant United States Attorney (Eric F. Melgren, United States Attorney, District of Kansas, Paul R. Almanza, Trial Attorney, United States Department of Justice, Washington, D.C., Nancy Landis Caplinger, Assistant United States Attorney, Topeka, Kansas, with her on the briefs), Kansas City, Kansas, for Plaintiff-Appellee.

Before **MURPHY**, **ANDERSON** and **McCONNELL**, Circuit Judges.

**McCONNELL**, Circuit Judge.

After an investigation of several harassing phone calls of a sexual nature to teenage boys in Missouri and Kansas, police identified Mr. James Riccardi as the caller. In a search of his home and later his computer, police found photographs and other images of child pornography, some of them taken by Mr. Riccardi of teenage boys whom he had paid or enticed into visiting his home and posing for his camera. Two of these boys—now adults—were located, and testified at trial.

Mr. Riccardi was tried before a jury and convicted on January 23, 2003, of two counts of possession of child pornography and two counts of use of an instrumentality of interstate commerce to entice a minor to engage in a prohibited sex act, in violation of 18 U.S.C. § 2252(a)(4)(B) and 18 U.S.C. § 2422(b) respectively. Count One involved pornographic images found on Mr. Riccardi's computer hard drive. Count Two involved pornographic photographs Mr. Riccardi took with his Polaroid camera. Counts Three and Five involved two teenage boys whom he enticed to his home to pose for pictures and engage in other illicit conduct. The district court granted a motion for acquittal on Count Four, an additional count of enticing a minor. Mr. Riccardi was sentenced to a total term of 262 months.

On appeal, Mr. Riccardi raises four arguments, which address each count of his conviction, and he contends that he was not sentenced in accordance with the

law. He first argues that his conviction on Count One should be reversed because the district court allowed evidence from the search of his computer hard drive, which he contends violated the Fourth Amendment for two independent reasons: (1) there was no probable cause to justify the search and seizure of the hard drive; and (2) the warrant and its execution did not comply with Tenth Circuit precedent concerning the particularity required for warrants involving searches of computer hard drives. He also argues that the officers did not execute the warrant in good faith, and thus that the good faith exception to the exclusionary rule should not apply.

Second, Mr. Riccardi argues that the district court should have dismissed Count Two because it involved intrastate non-economic activity and therefore is not subject to Congress' legislative authority under the Commerce Clause.

Third, Mr. Riccardi argues that there was insufficient evidence to sustain his conviction on Count One because there was not enough evidence to show that the individuals depicted in the images were under 18 years of age.

Fourth, he contends that Counts Three and Five are invalid because the prosecution put on no evidence to show that Mr. Riccardi used the telephone "to promote a performance" of a minor for sexual purposes.

Finally, he argues that the district court improperly interpreted the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") because it deemed

conduct 16 to 18 years prior to his conviction to be relevant conduct under U.S.S.G. § 1B1.3 and increased his base offense level accordingly.

After oral argument in this case, Mr. Riccardi moved to supplement his brief with an argument that the sentencing procedure was constitutionally defective under *Blakely v. Washington*, 124 S.Ct. 2531 (2004). The motion was granted. The Court invited further supplemental briefing after the Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738 (2005).

### The Facts

We summarize the facts of the case only insofar as they provide necessary background to the relevant legal issues. On at least four occasions in early 2002, Mr. Riccardi placed telephone calls to teenage boys in which he portrayed himself as a coach from the University of Missouri and offered the boys athletic scholarships. During the course of the conversations, he spoke of discipline and asked the boys prurient questions about the nature of corporal punishment they had received. In one instance, he asked whether the boy would be willing to "do anything" to make the team, including performing oral sex on the coach. During some of the calls, he asked the boys (whom he had earlier instructed to go to a secluded place), to drop their pants and spank or whip themselves as he listened over the phone. In one case, the teenager complied. Another one of Mr. Riccardi's targets pretended to spank himself, thinking it was one of his friends

calling as a joke.

Several of the calls were reported to the Higginsville, Missouri Police Department, where they were investigated by Detective Heidi Morgan. Detective Morgan contacted the University of Missouri and discovered that no one affiliated with the university had made the calls. She also learned that the university had received approximately 80 complaints about similar calls. Following reporting protocols and contacting other law enforcement departments in the area, Detective Morgan obtained the name and address of a suspect, Riccardi. She also contacted Detective John Dickey of the Leawood, Kansas Police Department, who was investigating a similar call Mr. Riccardi made to a boy in Leawood. After further investigation in coordination with Detective Dickey, Detective Morgan located Mr. Riccardi's place of employment and found a phone number for him.

Acting on the information she had thus far, Detective Morgan left messages for Mr. Riccardi at his place of employment and at a phone number she had discovered for him through an internet phone directory. Subsequently, she received and tape recorded a conversation with a caller who identified himself as James Riccardi. Detective Morgan played the tape of this conversation for the three teenage boys in Higginsville who had received the offensive calls. Each listened to the tape separately, and each identified the voice on the tape as the voice of the caller.

During approximately the same period, Detective Dickey confirmed Mr. Riccardi's residential address in Leawood, Kansas. He arranged for a search of trash left at the curbside in front of Mr. Riccardi's residence. This search uncovered prepaid calling cards issued by Qwest Communications. After subpoenaing records from Qwest, Detective Dickey learned that calls were made using these cards to persons who complained of receiving similar harassing telephone calls.

On May 6, 2002, Detective Dickey submitted an affidavit to a judge in Johnson County, Kansas, in support of an application for a search warrant for Mr. Riccardi's residence. The affidavit set forth the reasons for Detective Dickey's belief that probable cause existed to believe that Mr. Riccardi had made obscene or harassing phone calls to boys in several states. The affidavit described, among other things, the four calls in which Mr. Riccardi had portrayed himself as a University of Missouri athletic official. The affidavit also stated that Detective Morgan had learned that in 1998, an investigation of a similar call placed to a boy in Sweet Springs, Missouri, resulted in Mr. Riccardi being discovered talking on a pay phone with a copy of a local newspaper covering a Sweet Springs boys sports team in his car. Finally, the affidavit summarized the results of the investigation into the Qwest prepaid calling cards found in Mr. Riccardi's trash.

The judge authorized a search of Mr. Riccardi's residence for:

All records of telephone calls with juveniles including: Telephone records, telephone bills, directories and listings, telephone calling cards[;] Print outs of directory listings or telephone search results[;] . . . Pictures, videos or other depictions of juveniles . . . [; and] Notes, journals, or logs of calls or contact with juveniles.

Officer Dickey and other Leawood police officers, Detective Morgan, and David Finch of the Missouri Attorney General's High Tech Crimes Unit executed the warrant at 2:50 p.m. on May 6, 2002. They seized items including: (1) "approximately 300 Polaroid photographs of young men in various positions, nude and clothed"; (2) notes of telephone calls to young men, including high school yearbooks with handwritten telephone numbers next to student pictures; (3) miscellaneous papers with names of individuals, most of which had additional information that appeared to include phone numbers, grade levels, height, weight, and sport positions played; (4) a Polaroid camera; (5) three plays that depicted a homosexual lifestyle; (6) a Kinko's receipt, apparently signed by Mr. Riccardi, for Kinko's copying of four Polaroid photographs to computer disks; and (7) papers with notes of screen names such as Buff4U and KCBuffT near a computer in the home. The Kinko's receipt was in an envelope with four non-pornographic photographs of a young white male, who appeared to be a "young teenager" naked from the waist up. The receipt indicated that Mr. Riccardi paid $22.88 to have those pictures scanned to a computer disk. The investigating officers also noted that Mr. Riccardi had a personal computer.

Later that same day, Detective Dickey submitted another affidavit and application for a warrant to search and seize the computer. The affidavit described the photographs seized from Mr. Riccardi's house and stated that 50 to 80 of the photographs depicted nude boys posed in a sexually explicit manner. The affidavit also described the computer files the officers found and related that the computer had the capability to connect with the internet. It additionally described the Kinko's receipt and explained that converting photos to digital material would allow them to be disseminated over the internet. It finally explained that, based on the officer's experience, child pornographers frequently use computers to distribute and exchange child pornography over the internet and that a computer hard drive will often retain evidence of the child pornography in such cases.

The warrant issued, authorizing the "seizure" of Mr. Riccardi's computer and the search of "all electronic and magnetic media stored within such devices." This warrant, unlike the first, did not specify the nature of the materials the officers should examine. Later that day Detective Dickey and Agent Finch seized Mr. Riccardi's computer. During forensic examination of the computer, Agent Finch came across images of child pornography in thumbnail form. He suspended the search to review the search warrant language. Agent Finch asked Detective Dickey if he was sure that the warrant covered searches for child pornography.

Detective Dickey consulted with a prosecutor, who apparently assured him that it did, and Detective Dickey informed Agent Finch that the child pornography found on the computer would be covered by the warrant. According to Agent Finch, in his practice he defers to local prosecutors and authorities in matters such as legal interpretations of warrants.

Agents of the Missouri Attorney General's office completed their examination of Mr. Riccardi's hard drive on June 5, 2002. They found five images of what appeared to be minors engaged in sexual contact, as well as articles concerning high school athletics and images of adults engaged in sex acts. In addition, they found evidence that Mr. Riccardi used the internet to chat with boys and, in at least one case, that Mr. Riccardi asked the boy with whom he was chatting to spank himself.

Law enforcement officials were able to locate several of the persons depicted in the photographs recovered from Mr. Riccardi's home. Two of them testified at trial. One, Stephen Weller, testified that he had met Mr. Riccardi in the mid-1980s, when Mr. Weller was fourteen years of age, and that he was fourteen or fifteen years of age at the time the pictures were taken. He testified that Mr. Riccardi would pick him up at his grandparents' house and take him to Mr. Riccardi's home in Leawood, Kansas. This practice continued after Mr. Weller moved to the west side of Kansas City, Missouri, which meant that during

these times Mr. Riccardi brought the boy across state lines. Mr. Weller stated that during these encounters Mr. Riccardi paid him money to pose for pictures both naked and clothed.

Another witness, Jerry Rogers, testified that he met Mr. Riccardi in 1983 or 1984, when he was twelve or thirteen years old. According to Mr. Rogers, a mutual friend, Victor Grapes, introduced him to Mr. Riccardi. Mr. Rogers testified that he told Mr. Riccardi that he was thirteen when they first met. Mr. Rogers further testified that he came from a low income family, and that it was his understanding that he could make extra money and receive gifts by meeting with Mr. Riccardi. At the beginning of their meetings, Mr. Riccardi did not give Mr. Rogers anything, but, as time went on, Mr. Riccardi asked Mr. Rogers if he could take pictures of him in exchange for gifts. Within six months of meeting Mr. Rogers, Mr. Riccardi asked him if he could take nude pictures of him in exchange for more and better gifts, including money, jewelry, and tennis shoes. According to Mr. Rogers, Mr. Riccardi would pick him up at his house and, sometimes, tell him to duck so that he could not be seen. During these trips the two would cross state lines to get to Mr. Riccardi's house. Mr. Rogers testified that over the two year period of this relationship, Mr. Riccardi spanked him on 25 to 30 separate occasions; on these occasions, Mr. Rogers would be nude. Finally, Mr. Rogers identified himself as the person depicted in several of the photographs

taken from Mr. Riccardi's residence. He stated that he was approximately thirteen years of age when the pictures were taken, that Mr. Riccardi took them, and that Mr. Riccardi knew Mr. Rogers' age at the time he took the pictures. Mr. Rogers also stated that his friend, Victor Grapes, was depicted in several of the photographs seized from Mr. Riccardi's residence, and that Mr. Grapes was thirteen or fourteen years old when the pictures were taken.

## Discussion

**1.    Suppression of Images from the Computer Due to Alleged Violation of the Fourth Amendment (Count I)**

Mr. Riccardi argues that the district court erred in denying his motion to suppress images found on his computer both because there was no probable cause to justify the search, and because the warrant was insufficiently particular under Tenth Circuit standards. He further contends that the warrant was not executed in good faith, and thus that the good faith exception set forth in *United States v. Leon*, 468 U.S. 897 (1984), should not apply.

### A.    Standard of Review

When reviewing the denial of a motion to suppress we analyze factual matters for clear error and the determination of legal reasonableness de novo. *United States v. Kimoana*, 383 F.3d 1215, 1220 (10th Cir. 2004). We consider the totality of the circumstances and view the evidence in the light most favorable to the government. *Id.* Where the search or seizure was pursuant to a warrant, our

review of the issuing magistrate's finding of probable cause is very deferential:

"Our duty is to ensure that the magistrate judge had a 'substantial basis' for concluding that the affidavit in support of the warrant established probable cause." *United States v. Nolan*, 199 F.3d 1180, 1182 (10th Cir. 1999) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). "The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238; *accord United States v. Simpson*, 152 F.3d 1241, 1246 (10th Cir. 1998); *United States v. Janus Indus.*, 48 F.3d 1548, 1552 (10th Cir. 1995). Moreover, "[e]ven if we conclude that the warrant was not supported by probable cause, we may still uphold the search if we conclude that the good-faith exception to the exclusionary rule contained in *United States v. Leon*, 468 U.S. 897 (1984) . . . applies." *Rice*, 358 F.3d at 1274. "The applicability of the *Leon* good-faith exception is a question of law which this court reviews *de novo*." *United States v. Rowland*, 145 F.3d 1194, 1206 (10th Cir. 1998).

**B.      Probable Cause: The Initial Seizure of the Computer**

Mr. Riccardi first contends that no probable cause existed to support a warrant to seize and search his computer. We find this argument unconvincing.

Detective Dickey's affidavit contains the following facts in support of

probable cause: (1) that Mr. Riccardi called teenage boys for his gratification; (2) that his home contained a number of sexual photographs of teenage boys in the nude; (3) that a receipt from Kinko's showed that he had photographs digitalized for a computer format; (4) that the computer was capable of storing digitized images; and (5) that, based on Dickey's experience, possessors of child pornography often obtain and retain images of child pornography on their computers.

In our judgment, this is more than enough to support the magistrate's judgment that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. Mr. Riccardi's collection of some 300 photographs of young men, 50 to 80 of them naked in sexually suggestive poses, is sufficient to indicate the nature of his interests. The presence of a computer with an internet hook-up and a Kinko's receipt indicating that Mr. Riccardi had converted Polaroid photos into a digitized format, gives rise to a fair inference that the computer will contain images similar to the photographs.

Mr. Riccardi makes two principal points in response. First, he argues that the Kinko's receipt, being five years old, is too stale to support probable cause. *See United States v. Snow*, 919 F.2d 1458, 1459 (10th Cir. 1990) ("Probable cause to search cannot be based on stale information that no longer suggests that the

-13-

items sought will be found in the place to be searched."). Second, he argues that because the Kinko's receipt was found in an envelope with non-pornographic pictures, it provides no support for the inference that he had converted pornographic pictures to a computer format.

Whether information is stale depends on "the nature of the criminal activity, the length of the activity, and the nature of the property to be seized." *Snow*, 919 F.2d at 1460 (citations omitted). The Kinko's receipt may have been five years old, but it showed that Mr. Riccardi had the desire and ability to convert Polaroid photographs to a digital format, which, as Detective Dickey explained in his affidavit, is a common means by which child pornographers distribute and exchange their materials. When the receipt is considered in the context of other information in the affidavit—the apparent duration of Mr. Riccardi's harassment and solicitation of minors, the existence of sexually explicit pictures of minors found nearby, the screen names, and the observation that possessors often keep electronic copies of child pornography—it provides an ample nexus for the finding of probable cause. *See, e.g.*, *United States v. Sturmoski*, 971 F.2d 452, 457 (10th Cir. 1992) (holding that when the offense in question is ongoing and continuing in nature, "the passage of time is not of critical importance"); *accord United States v. Schaefer*, 87 F.3d 562, 568 (1st Cir. 1996). This is especially the case given the nature of Mr. Riccardi's criminal

activity, the possession of child pornography. As one court has explained:

> The observation that images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes is supported by common sense and the cases. Since the materials are illegal to distribute and possess, initial collection is difficult. Having succeeded in obtaining images, collectors are unlikely to destroy them. Because of their illegality and the imprimatur of severe social stigma such images carry, collectors will want to secret them in secure places, like a private residence. This proposition is not novel in either state or federal court: pedophiles, preferential child molesters, and child pornography collectors maintain their materials for significant periods of time.

*United States v. Lamb*, 945 F. Supp. 441, 460 (N.D.N.Y. 1996) (citing, among others, *United States v. Harvey*, 2 F.3d 1318, 1322-23 (3d Cir. 1993); *United States v. Koelling*, 992 F.2d 817, 823 (8th Cir. 1993); *United States v. Rabe*, 848 F.2d 994, 997 (9th Cir. 1988)).

As to Mr. Riccardi's observation that the photographs in the envelope with the receipt were non-pornographic, this misses the point. The logical inference was not simply that these particular pictures—four photos of a teenage boy naked from the waist up—were likely to be found on Mr. Riccardi's computer, but that the proximity of the receipt and the computer to hundreds of other Polaroid shots of teenage males, many of them pornographic, made it likely that some of these, too, had been converted to a computer format, from which they could be distributed over the internet.

C.    **Particularity: The Subsequent Search of the Computer Files**

-15-

The district court held that the warrant to seize and examine Mr. Riccardi's computer failed to satisfy the Fourth Amendment's particularity requirement, but that the law enforcement officers acted in good faith in executing the warrant. Mr. Riccardi agrees that the warrant failed the particularity requirement, but he challenges the district court's application of the good faith exception. We agree with the district court.

The Fourth Amendment mandates that "no Warrants shall issue . . . without particularly describing the place to be searched." U.S. Const. amend. IV. "The manifest purpose of this particularity requirement was to prevent general searches. By limiting the authorization to search the specific areas . . . , the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987); *see also Voss v. Bergsgaard*, 774 F.2d 402, 404 (10th Cir. 1985); *United States v. Campos*, 221 F.3d 1143, 1147 (10th Cir. 2000).

In *United States v. Leary*, 846 F.2d 592 (10th Cir. 1988), we set out the general standard for evaluating when the Fourth Amendment's particularity requirement has been met. There we explained:

> A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized. Even a warrant that describes the items to be seized in broad or generic terms may be valid when the description is as specific as the

circumstances and the nature of the activity under investigation permit. However, the fourth amendment requires that the government describe the items to be seized with as much specificity as the government's knowledge and circumstances allow, and warrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized.

*Id.* at 600 (internal quotations and citations omitted). In *United States v. Carey*, 172 F.3d 1268, 1271 (10th Cir. 1999), this Court applied the particularity requirement to the search of computer files. As summarized in a subsequent decision:

The underlying premise in *Carey* is that officers conducting searches (and the magistrates issuing warrants for those searches) cannot simply conduct a sweeping, comprehensive search of a computer's hard drive. Because computers can hold so much information touching on many different areas of a person's life, there is a greater potential for the "intermingling" of documents and a consequent invasion of privacy when police execute a search for evidence on a computer. . . . Thus, when officers come across computer files intermingled with irrelevant computer files, they may seal or hold the computer pending approval by a magistrate of the conditions and limitations on a further search of the computer. . . . Officers must be clear as to what it is they are seeking on the computer and conduct the search in a way that avoids searching files of types not identified in the warrant.

*United States v. Walser*, 275 F.3d 981, 986 (10th Cir. 2001) (internal quotations and citations omitted). Our case law therefore suggests that warrants for computer searches must affirmatively limit the search to evidence of specific federal crimes or specific types of material. *See id.*; *Campos*, 221 F.3d at 1147.

The warrant in this case was not limited to any particular files, or to any

particular federal crime.  The warrant authorized the "seizure" of Mr. Riccardi's computer

> and all electronic and magnetic media stored therein, together with
> all storage devises [sic], internal or external to the computer or
> computer system, including but not limited to floppy disks, diskettes,
> hard disks, magnetic tapes, removable media drives, optical media
> such as CD-ROM, printers, modems, and any other electronic or
> magnetic devises used as a peripheral to the computer or computer
> system, and all electronic media stored within such devises.

Motion to Suppress Physical Evidence, R. Vol. I Doc. 25, Attachment D, at 1.  It concluded with a command to "execute this warrant by searching the . . . thing or means of conveyance hereinbefore specified for such items, and to seize and hold such items to be dealt with according to law and make due return of this warrant whether executed or not." *Id.* at 2.  By its terms, the warrant thus permitted the officers to search for anything—from child pornography to tax returns to private correspondence.  It seemed to authorize precisely the kind of "wide-ranging exploratory search[] that the Framers intended to prohibit." *Garrison*, 480 U.S. at 84.

In this connection, we note that the first warrant—for a search of Mr. Riccardi's home—was limited to "records of telephone calls with juveniles," "[p]rint outs of directory listings or telephone search results," "pictures, videos or other depictions of juveniles," and "[n]otes, journals, or logs of calls or contact with juveniles."  The second warrant could have been similarly limited.  The

second warrant, unlike the first, did not describe the objects of the search "with as much specificity as the government's knowledge and circumstances allow," as our precedents demand. *Leary*, 846 F.2d at 600. We therefore agree with the district court that the warrant lacked the specificity required by *Carey* and its progeny.[1]

### D. Does the Good Faith Exception Apply?

Evidence seized pursuant to an invalid warrant does not necessarily have to be suppressed. In *Leon*, the Supreme Court recognized an exception to the exclusionary rule when officers act in good faith and in reasonable reliance on an invalid warrant in executing their search. 468 U.S. 897. The Court held that the purpose of the exclusionary rule is to deter police misconduct, and that the suppression of evidence obtained pursuant to a warrant should be ordered only in the unusual cases in which exclusion will further the purposes of the exclusionary rule. *Id.* at 918. "Where an officer acting with objective good faith obtains a search warrant from a detached and neutral magistrate and the executing officers act within its scope, there is nothing to deter." *Nolan*, 199 F.3d at 1184; *United States v. Tuter*, 240 F.3d 1292, 1298-99 (10th Cir. 2001).

---

[1] Where the warrant itself is insufficiently specific regarding the items to be searched and seized, this Court has held that the affidavit in support of the warrant can cure the want of specificity, but only if the affidavit is both incorporated in and attached to the warrant. *United States v. Dahlman*, 13 F.3d 1391, 1395 (10th Cir. 1993); *United States v. Leary*, 846 F.2d, 603 (10th Cir. 1988). Nothing in the record indicates that the affidavit was attached to the warrant, and the exception therefore does not apply. *See Groh v. Ramirez*, 124 S. Ct. 1284, 1290 (2004).

In determining whether the good-faith exception should apply in a particular case, the "inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23. In answering this question, the court should consider all of the circumstances and assume that the executing officers have a "reasonable knowledge of what the law prohibits." *Id.* at 919 n.20. Even if the court finds the warrant to be facially invalid—as was the case here—it "must also review the text of the warrant and the circumstances of the search to ascertain whether the agents might have reasonably presumed it to be valid." *Leary*, 846 F.2d at 607 (quoting *Leon*, 468 U.S. at 923) (marks and brackets omitted)). Whether the good faith exception should be applied is a question of law, subject to de novo review by the appellate court. *Id*. at 606.

In this case, upon finding thumbnail files of child pornography on Mr. Riccardi's computer, Agent Finch suspended his search and asked Detective Dickey if they needed a more specific warrant. Detective Dickey consulted with a prosecutor who gave assurances that an additional warrant was not required. Detective Dickey then informed Agent Finch that it would "likely be okay" and that the warrant covered the child pornography found on the computer.

The district court noted the following factors in support of applying the

*Leon* exception: (1) the affidavit limited the search to child pornography; (2) the officers executing the warrant were involved in the investigation throughout, and one of the executing officers actually wrote the affidavit to support the application; (3) Agent Finch stopped to ask if the warrant was sufficient and received assurances from Detective Dickey; (4) the search methodology was limited to finding child pornography; and (5) investigators seized only evidence relevant to the crimes identified in the affidavit.

These factors, combined with the fact that, at Agent Finch's request, Detective Dickey called the prosecutor for assurances, persuade us that the district court was correct in finding that the *Leon* exception to the exclusionary rule applied and that the evidence obtained from the hard drive need not have been suppressed. The officers remained within the terms of the warrant as well as the affidavit, and did not conduct a "fishing expedition" beyond the scope of the authorized investigation. They did not search for, or seize, any materials for which probable cause had not been shown. By consulting the prosecutor, they showed their good faith in compliance with constitutional requirements. Nor do we think the defect in the warrant was so flagrant or obvious that "the executing officers [could] not reasonably presume it to be valid." *Leon*, 468 U.S. at 923.

In arguing that the good faith exception does not apply, Mr. Riccardi relies on *United States v. Leary*, 846 F.2d 592 (10th Cir. 1988), a case in which this

Court declined to apply the good faith exception to a search pursuant to an overbroad warrant. We think that *Leary* is distinguishable. First and foremost, the problem in *Leary* was not just that the warrant was overbroad in its terms, but that the investigators seized a broad array of materials beyond the scope of any investigation that could have been justified by probable cause. *See id.* at 594-95 (describing the materials searched), 605-06 (describing the scope of probable cause). In this case, by contrast, the investigating officers carefully limited their search to files relevant to the investigation, and within the scope of the search as described by the affidavit. Moreover, in this case, unlike *Leary*, the officers temporarily suspended their search to examine the terms of the warrant and to obtain legal counsel. They resumed the search only after receiving assurance from the prosecutor that they were acting lawfully. The Court in *Leary* concluded that "[t]his is one of those 'unusual' cases where suppression of the evidence is appropriate to deter government misconduct." *Id*. at 610. By contrast, this is an example of the more "usual" case in which the executing officers acted in good faith.

We therefore affirm the decision of the district court to deny Mr. Riccardi's motion to suppress.

2. **As-Applied Challenge to 18 U.S.C. § 2252(a)(4)(B) Because of a Lack of Nexus to Interstate Commerce (Count II)**

Mr. Riccardi maintains that the district court erred in declining to dismiss

Count Two because application of 18 U.S.C. § 2252(a)(4)(B) to his case would exceed the enumerated power granted Congress under the Commerce Clause, Article I, § 8 of the United States Constitution. Aplt. Br. 38. He asserts that because he produced his Polaroid pornography at home it had no nexus to interstate commerce. When the constitutional sufficiency of an indictment is challenged, this Court reviews the district court's decision de novo. *United States v. Wood*, 958 F.2d 963, 974 (10th Cir. 1992).

Count Two of the Superceding Indictment charged Mr. Riccardi as follows:

On or about the 6th day of May, 2002, in the District of Kansas,

JAMES RICCARDI

knowingly and intentionally possessed one or more materials which contained visual depictions of minors, the production of which involved the use of minors engaging in sexually explicit conduct, and which visual depictions were of such conduct and were produced using materials which had been mailed shipped or transported interstate or foreign commerce, in violation of Title 18, United States Code, Section 2252(a)(4)(B).

Rec. Vol. I Doc. 32. Mr. Riccardi argues that the charge pursuant to § 2252(a)(4)(B) is unconstitutional as applied to him, because "he possessed child pornography in a purely intrastate fashion, with no evidence of an economic or commercial motive. The Government adduced no evidence that Mr. Riccardi ever sold or traded the photographs, or that the photographs were ever mailed, shipped, or transported across state lines." Aplt. Br. 46. Under Mr. Riccardi's theory, to impose criminal liability for these actions pursuant to Congress' authority under

the Commerce Clause would exceed the authority granted Congress by the Constitution.

The Constitution grants Congress the power "[t]o regulate Commerce . . . among the several States." U.S. Const. Article I, §8. This power, while broad, is not without limit. As the Court noted in *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 194-95 (1824), as "[c]omprehensive as the word 'among' is, it may be very properly restricted to that commerce which concerns more States than one . . . . The enumeration presupposes something not enumerated; and that something, if we regard the language, or the subject of the sentence, must be the exclusively internal commerce of a State."

In recent years, the Supreme Court has rendered several decisions defining the reach of Congress' authority under the Commerce Clause. *See, e.g.*, *United States v. Morrison*, 529 U.S. 598 (2000); *United States v. Lopez*, 514 U.S. 549 (1995). In *Lopez*, the Supreme Court noted that, in using power to regulate interstate commerce, Congress may regulate "three broad categories" of activities:

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce.

514 U.S. at 558-59 (internal citations omitted). For our purposes, at least in the

abstract, it would seem that the possession of home-produced child pornography concerns neither the channels nor the instrumentalities of interstate commerce.  It follows, then, that the possession of child pornography must "substantially affect interstate commerce" in order for Congress to regulate it under the Commerce Clause.  *Id.* at 559.

In *Morrison*, the Court enumerated four factors for lower courts to consider to determine whether a given activity substantially affects interstate commerce: (1) whether the statute relates to an activity that has something to do "with 'commerce' or any sort of economic enterprise, however broadly one might define those terms"; (2) whether the statute contains an "express jurisdictional element which might limit its reach" to those activities having "an explicit connection with or effect on interstate commerce"; (3) whether congressional findings in the statute or legislative history support the judgment that the activity in question has a substantial effect on interstate commerce; and (4) whether the link between the activity and a substantial effect on interstate commerce is attenuated.  529 U.S. at 610-13.  The *Morrison* Court applied these factors to conclude that 42 U.S.C. § 1981, which provided a federal civil remedy for victims of gender-motivated violence under the Violence Against Women Act, exceeded Congress' legislative authority under the Commerce Clause, as applied to a crime that did not involve the crossing of borders and that had a non-economic motivation.  The *Morrison*

Court held that intrastate violence against women does not "substantially affect" interstate commerce. In doing so, the Court "reject[ed] the argument that Congress may regulate non-economic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. The Constitution requires a distinction between what is truly national and what is truly local." *Id.* at 617-18.

It appears that two factors are most salient in the Court's analysis: whether the activity being regulated is "economic" and whether it is "interstate" in the sense of crossing state lines or affecting more states than one. Where the activity is economic in nature, the Court is more likely to find that, aggregated with similar conduct, it will have a substantial effect on interstate commerce, even if the specific activity at issue is intrastate. *See Wickard v. Filburn*, 317 U.S. 111 (1942), *cited with approval in Lopez*, 514 U.S. at 556. Where the activity crosses state lines, the Court is more likely to find that it falls within the Commerce Clause even if it is not specifically "economic" in nature. *Champion v. Ames*, 188 U.S. 321 (1903); *Hoke v. United States*, 227 U.S. 308 (1913). Only where the activity subject to regulation is both intrastate and non-economic is the Court likely to find it beyond congressional power. *See, e.g., Morrison, supra*.

Many of our sister circuits have considered the constitutionality under the Commerce Clause of § 2252(a)(4)(B), as well as the analogous jurisdictional

provision found in 18 U.S.C. § 2251(a), which criminalizes child pornography production. Of the nine circuits to address the issue, six have found such jurisdiction a valid exercise of Congress' Commerce Power. *See United States v. Morales-De Jesus*, 372 F.3d 6, 10, 17-18 (1st Cir. 2004) (upholding a conviction under § 2251 finding that aggregated local intrastate production has a "substantial effect" on interstate commerce); *United States v. Holston*, 343 F.3d 83, 88-91 (2d Cir. 2003) (concluding that the activity proscribed by § 2251 is economic in nature and can be regulated at the intrastate level by Congress); *United States v. Buculei*, 262 F.3d 322, 329 (4th Cir. 2001) ("There can be no doubt that the production of visual depictions of minors engaging in sexually explicit conduct, i.e., child pornography, is economic in nature."); *United States v. Hoggard*, 254 F.3d 774, 746 (8th Cir. 2001) (affirming conviction under § 2251); *United States v Kallestad*, 236 F.3d 225, 228-31 (5th Cir. 2000) (affirming a conviction under § 2252(a)(4)(B) on the ground that the statute regulates an activity that has a "substantial effect" on interstate commerce in light of the *Morrison* factors); *United States v. Angle*, 234 F.3d 326, 338 (7th Cir. 2000) (affirming a § 2252(a)(4)(B) conviction under a market theory; the statute "prohibits intrastate activity that is substantially related to the closely regulated interstate market of child pornography"); *United States v. Rodia*, 194 F.3d 465, 476 (3d Cir. 1999) (affirming conviction under § 2252(a)(4)(B) under market theory); *United States*

*v. Robinson*, 137 F.3d 652, 656 (1st Cir. 1998) (affirming a conviction under §
2252(a)(4)(B) because the local possession of child pornography "'through
repetition elsewhere,' . . . helps to create and sustain a market for sexually
explicit materials depicting minors" and thus substantially affects the
instrumentalities of interstate commerce).

Four decisions from three circuits have held prosecutions for possession of
home-made child pornography unconstitutional as exceeding congressional power
under the Commerce Clause. *See United States v. Smith*, 2005 WL 628686 (11th
Cir., Mar. 18, 2005); *United States v. Maxwell*, 386 F.3d 1042 (11th Cir. 2004);
*United States v. McCoy*, 323 F.3d 1114 (9th Cir. 2003); *United States v. Corp*,
236 F.3d 325 (6th Cir. 2001). Three of these decisions involved factual
circumstances with much more tenuous connections to interstate commerce than
the facts present here. *Maxwell* concluded that the application of § 2252(a)(4)(B)
was unconstitutional where the interstate transfer of blank computer disks was the
sole connection to interstate commerce introduced at trial. 386 F.3d at 1049.[2]

---

[2] The *Maxwell* court stated:

   In this case, the Government established that Maxwell knowingly
   possessed child pornography in Florida. That pornography was saved
   on computer disks that had traveled from out-of-state before they
   contained illegal images. The Government proved nothing more.
   Apart from the origin of the disks (before they had been committed
   to nefarious purposes), Maxwell's case involved no apparent
   connection to activity beyond Florida.

(continued...)

*McCoy* involved a single family photograph of a child taken by a parent with, according to the Ninth Circuit, no commercial or interstate component. 323 F.3d at 1115. *Corp* involved several photographs taken by a 23-year-old man of a 17-year-old girl who was within months of majority status, 236 F.3d at 326.[3] None

<hr>

[2](...continued)

*Maxwell*, 386 F.3d at 1054; *see also id.* at 1058 ("As far as interstate commerce is concerned, Maxwell has done nothing more than possess two disks that traveled from out-of-state."). The court's constitutional analysis was based on this characterization of the facts.

 Elsewhere in the opinion, the court mentioned other facts proved by the government that suggested more substantial ties to interstate commerce. There was testimony that Maxwell, under the user profile name "boy lover69 69," had accessed an internet group where files could be shared among users. See *id*. at 1048. This internet website contained three folders associated with Maxwell's account, entitled "boys," "boys2," and "boys3." *Id.* Certain e-mail messages suggested that Maxwell had been a member of several internet groups with names such as "gay & bi teens." *Id.* The court also heard testimony regarding nine uncharged images of child pornography in temporary internet folders on the computer used by Maxwell. *Id.* at 1049. The record contained evidence that child pornography had been accessed online from the computer used by Maxwell. *Id.* at 1050. Finally, Maxwell raised a statutory defense that he had not "produced" but had only "copied" the child pornographic images, presumably from the internet. *Id.* at 1052.

 These facts demonstrate that the defendant possessed his child pornographic images in a form readily transferred across state and international lines via the internet. The opinion does not explain why these connections to instrumentalities of interstate communications did not supply a constitutionally sufficient nexus to interstate commerce. The holding of the case, nonetheless, is limited to facts in which the only nexus to interstate commerce is that the images were copied onto blank computer disks which had traveled in interstate commerce. *Id.* at 1068.

[3] The Sixth Circuit subsequently distinguished *Corp* based on its unique set
(continued...)

of these decisions held § 2252(a)(4)(B) facially unconstitutional; *Maxwell* and

*Corp* found it unconstitutional only as applied, *see Maxwell*, 386 F.3d. at 1052-53

& n.12; *Corp*, 236 F.3d at 332-33, and *McCoy* found it unconstitutional only as

applied to McCoy and "others similarly situated," defined as those who merely

possess a visual depiction intrastate where the depiction has not been mailed,

shipped, or transported interstate and "is not intended for interstate distribution or

for economic or commercial use, including the exchange of the prohibited

material for other prohibited material." 323 F.3d at 1127, 1133. The Ninth

Circuit has subsequently held that § 2252(a)(4)(B) is facially constitutional,

expressly limiting *McCoy*'s holding to its facts. *See United States v. Adams*, 343

F.3d 1024, 1029-30 (9th Cir. 2003).[4]

Arguing that his conduct was not interstate in nature, Mr. Riccardi relies

---

[3](...continued)
of facts. *See United States v. Andrews*, 383 F.3d 374, 376-79 (6th Cir. 2004)
(finding that in a more exploitative situation there was a sufficient nexus between
the charged activity and interstate commerce to support jurisdiction under §
2251(b), which uses jurisdictional language similar to § 2251(a) and §
2252(a)(4)(B)).

[4]The decision in *United States v. Smith*, 2005 WL 628686 (11th Cir., Mar.
18, 2005), involved a less attenuated connection to interstate commerce. In that
case, the defendant possessed large numbers of child pornographic images, and
the evidence showed that "a number of photos" were of a fourteen year old girl
whom the defendant paid to pose. *Id.* at *2. Without expressing an opinion
regarding that decision, we note that the case is distinguishable on the ground that
the paid models were not transported for that purpose across state lines, as they
were in this case.

upon the Ninth Circuit's decision in *McCoy*. In considering this argument, we emphasize that Mr. Riccardi brings an "as applied," not a facial, challenge to the statute. Thus, the question is not whether the statute might be unconstitutional in some range of cases, but whether, under the particular facts of this case, Mr. Riccardi's activities fall outside the scope of congressional authority. We think they do not. As shown by the evidence at trial, Mr. Riccardi's activities have a direct and significant interstate component: namely, he transported his photographic subjects, teenage boys, across state laws for the purpose of producing pornography and engaging in other illicit sexual activities. Moreover, his activities had an economic component not found in *Maxwell*, *McCoy*, or *Corp*: he paid the boys to pose for the photographs.

For instance, as discussed above, one of his victims, Stephen Weller, testified that he had met Mr. Riccardi in the mid-1980s, when Mr. Weller was 14 years of age. On the stand, Mr. Weller stated that Mr. Riccardi would pick him up at his home on the west side of Kansas City, Missouri, and transport him to Mr. Riccardi's home in Leawood, Kansas. In his testimony, Mr. Weller explained that during these encounters Mr. Riccardi paid him money to pose for pictures both naked and clothed. Similarly, Jerry Rogers testified that he met Mr. Riccardi in 1983 or 1984, when he was twelve or thirteen years old. According to Mr. Rogers, Mr. Riccardi asked him if he could take nude pictures of him in exchange

for such things as money, jewelry, and tennis shoes. According to Mr. Rogers, Mr. Riccardi would pick Mr. Rogers up at his house and, sometimes, tell him to duck so that he could not be seen by people around. During these trips the two would cross state lines to get to Mr. Riccardi's house.

In its interstate dimension, this case is therefore on all fours with *Hoke*, 227 U.S. 308. In *Hoke*, a unanimous Supreme Court upheld the convictions of two defendants for enticing and transporting women across state lines for the purpose of prostitution. Against the argument that this exceeded the authority of Congress under the Commerce Clause, the Court stated: "Commerce among the states . . . consists of intercourse and traffic between their citizens, and includes the transportation of persons and property." 227 U.S. at 320. Just as Congress can prohibit the transportation of articles of merchandise across state lines, the Court explained, it could regulate the transportation of persons. *Id.* at 322.

It may also be significant that, in contrast to *McCoy* and *Corp*, Mr. Riccardi possessed large numbers of photographs, which might well be the objects of commerce (even if they were not) and which could stimulate a commercially significant demand for more. As the district court noted:

> Here, on the other hand, the jury unanimously found that Mr. Riccardi possessed 40 separate photographs depicting minors, to which he had no familial relationship, engaged in sexually explicit conduct. In addition to those photographs, the government presented evidence that Mr. Riccardi possessed hundreds of photographs best described as child erotica. As such, his intrastate possession of child

-32-

pornography had a far more substantial and demonstrable impact on the interstate market than did the single photograph in *McCoy*, rendering the aggregate theory more applicable given the facts of this case.

*United States v. Riccardi*, 258 F.Supp.2d 1212, 1229 (D. Kan. 2003).

Because Mr. Riccardi both paid the young men who posed for his photographs and transported them across state lines, the facts of this case satisfy at least two of the *Morrison* factors: (1) the activity that has something to do "with 'commerce' or any sort of economic enterprise, however broadly one might define those terms"; and (2) the link between the activity and a substantial effect on interstate commerce is not attenuated. 529 U.S. at 610-11.

It might be argued that these facts linking Mr. Riccardi's conduct to interstate commerce cannot be considered because they go beyond the elements of the statutory violation. But that is always true in an "as applied" challenge. As another court has noted: "If the elements of the crime . . . required showings that were always sufficient to establish Congress's authority for its enactment and application, then every conviction under the statute would be valid . . . ." *Maxwell*, 386 F.3d at 1069. The existence and coherence of "as applied" challenges under the Commerce Clause necessarily presupposes that the constitutionality of some applications of a facially valid statute will, and some will not, have sufficient nexus to interstate commerce, and that this will be based on the particular facts of the case.

It is not necessary for this Court to consider the constitutionality of the statute as applied to cases with more attenuated connections to interstate commerce, such as those in *Maxwell*, *McCoy*, and *Corp*, and we express no opinion regarding the results in those cases. It is enough to conclude that, as applied under the far different facts of this case, there is an ample nexus to interstate commerce. Mr. Riccardi both paid the boys he photographed and transported them across state lines to produce the pornography he was found guilty of possessing. He also possessed large numbers of photographs that were susceptible to commercial use. We therefore affirm the district court's denial of Mr. Riccardi's motion to dismiss the indictment regarding Count Two.

**3.     The Necessity of an Expert to Verify That Images from the Hard Drive Were of Minors (Count I)**

In support of conviction on Count One, the government was permitted, over objection, to submit into evidence two photographs seized from Mr. Riccardi's computer. Both showed naked young males engaged in oral sex. Mr. Riccardi argued at trial, and repeats the argument here, that in the absence of expert testimony there was insufficient evidence to prove that the persons depicted in the photographs were minors. He thus argues that the district court erred in denying his motion for a judgment of acquittal on Count One. He does not make this argument regarding Count Two, presumably because the boys (now adults) testified that they were minors when Mr. Riccardi photographed them. We review

-34-

a district court's "denial of a motion for judgment of acquittal *de novo*, viewing the evidence in light most favorable to the government." *United States v. Bailey*, 327 F.3d 1131, 1140 (10th Cir. 2003) (quoting *United States v. Austin*, 231 F.3d 1278, 1283 (10th Cir. 2000)). We "may reverse the jury's verdict 'only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *United States v. Haslip*, 160 F.3d 649, 652 (10th Cir. 1998)).

Both sides agree that in some cases involving depictions of post-pubescent teenagers, expert testimony may be required to establish that they were minors, and that this judgment must be made on a case-by-case basis. *United States v. Katz*, 178 F.3d 368, 373 (5th Cir. 1999). The question in this case is whether the photographs in question fall into that category.

The district judge undertook a careful examination of the photographs with this issue in mind. The government originally submitted six photographs into evidence, but the district court concluded that four of them involved subjects close enough to the age of eighteen that a lay person could not reliably tell the difference without expert assistance. As to the two photographs now at issue, the court ruled: "I agree with counsel for the United States that a reasonable jury could find beyond a reasonable doubt that they depict models under the age of 18 who are engaged in sexually explicit conduct." Tr. 912. He explained that "a

layperson who has any common experience of life in observing children would be able to draw those conclusions from observing those images; therefore, the jury in this case should be permitted to exercise their common experience and determine whether or not they are persuaded beyond a reasonable doubt that . . . the person is under 18." Tr. 912-13.

We have reviewed the photographs from the record in question, and see no reason to disagree with the district court. Our precedents suggest that experts are not necessarily required to aid in such factual determinations. *See, e.g.*, *United States v. Kimler*, 335 F.3d 1132, 1144 (10th Cir. 2003) (distinguishing actual from virtual subjects in computer photographs); *United States v. Harms*, 371 F.3d 1208, 1212 (10th Cir. 2004) (same). We therefore affirm the district court's denial of Mr. Riccardi's motion for judgment of acquittal.

### 4. Did Mr. Riccardi Violate K.S.A. § 21-3516 and Therefore Violate 18 U.S.C. § 2422(b)? (Counts III and V)

Mr. Riccardi also moved for judgment of acquittal on Counts Three and Four, arguing that his conduct did not violate the state statute on which his federal charge under 18 U.S.C. § 2242(b) was based. As noted above, we review a district court's "denial of a motion for judgment of acquittal de novo, viewing the evidence in light most favorable to the government." *United States v. Bailey*, 327 F.3d 1131, 1140 (10th Cir. 2003) (quoting *United States v. Austin*, 231 F.3d 1278, 1283 (10th Cir. 2000)). We "may reverse the jury's verdict 'only if no

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *United States v. Haslip*, 160 F.3d 649, 652 (10th Cir. 1998), *cert. denied*, 526 U.S. 1044 (1999)).

The Government charged that Mr. Riccardi used the telephone to "persuade[], induce[], entice[], or coerce[]" a minor under 18 "to engage in" "any sexual activity for which a person can be charged with a criminal offense[,]" in violation of 18 U.S.C. § 2422(b).  The Government referred to K.S.A. § 21-3516, a Kansas statute which prohibits enticing underage minors to engage in sexually explicit conduct for the purpose of promoting a "performance."  The "performance" to which the government referred was the teenage boys spanking or whipping themselves while Mr. Riccardi listened over the telephone.  Mr. Riccardi argues that in order to be a "performance" under K.S.A. § 21-3516 the actions must be in public.  Because the "performance" of the boys on the telephone was not public, Mr. Riccardi's theory goes, he did not violate the statute.

K.S.A. § 21-3516 defines "promoting" as:

procuring, selling, providing, lending, mailing, delivering,
transferring, transmitting, distributing, circulating, disseminating,
presenting, producing, manufacturing, issuing, publishing,
displaying, exhibiting or advertising.

K.S.A. § 21-3516 defines "performance" as, among other things, "any play or other live presentation."

This court is bound to interpret Kansas law as would a Kansas Court. *United States v. DeGasso*, 369 F.3d 1139, 1545 (10th Cir. 2004). Neither party has pointed out any decision by a Kansas court that gives any other guidance to discern the meaning of the statute's terms "promoting" or "performance," and we are therefore left with the statute's own definitions. "Where no controlling state court decision exists, the federal court must attempt to predict what the state's highest court would do." *Id.* at 1145. In accordance with Kansas's rules of interpretation "[o]ur goal is to implement the intent of the legislature according to the plain language of the provision in question." *Roderick v. Estate of Wikoff*, 31 P.3d 307, 310 (Kan. App. 2001) (citing *City of Wichita v. 200 South Broadway*, 855 P.2d 956 (Kan. 1993); *see also Shusterman v. United States*, 63 F.3d 986, 989 (10th Cir. 1995) ("In statutory interpretation we look to the plain language of the statute to give effect to its meaning."). In our judgment, the procuring of a "performance" includes using enticements to induce a person to perform certain acts within the sight or hearing of another, for the observer's enjoyment. If someone else had enticed the boys to spank themselves for Mr. Riccardi's listening pleasure, no one would question that he had procured a "performance." It was no less a "performance" when Mr. Riccardi procured the same result by playing on the hopeful young athletes' desire to win a scholarship to play at the University of Missouri.

Mr. Riccardi argues that the statute "was intended by the legislature to combat the *public* market for child pornography by punishing those who possess such pornography in some form of media, and those who are responsible for disseminating publicly child pornography in the form of visual or audio media, or via some live, *public* performance." Aplt. Br. 55 (emphasis in original). We do not think the term is so limited. "Performances" need not be recorded, and they can be to an audience of one. Was David not "performing" when he played his lyre for King Saul at odd hours of the night? *1 Sam.* 16:23. Is a court jester not "performing" when he amuses a solitary royal audience? *See*, *e.g.,* William Shakespeare, *King Lear*, act III, scene ii, lns. 1-35, *in* The Complete Pelican Shakespeare 1083 (Viking Press 1984). Does a stripper not "perform" when she is in a booth in front of a solitary voyeur? If courts were to accept Mr. Riccardi's proposed definition, sex entrepreneurs could satisfy their clients' desires by enticing or coercing children into providing "for your eyes only" performances, without risk of prosecution. Taken to its logical extension, Mr. Riccardi's argument would essentially have us conclude that staples of the sex industry such as phone sex and peepshows are not performances.

For these reasons, we cannot say that the district court erred in denying Mr. Riccardi's motions for acquittal on these counts, and his convictions on Counts Three and Five are therefore affirmed.

**5.     Did the District Court Improperly Calculate Mr. Riccardi's Base
        Level under U.S.S.G. § 2G2.1 and U.S.S.G. § 1B1.3?**

Mr. Riccardi challenges the district court's application of the Sentencing

Guidelines in this case.  We have yet to articulate the exact contours of our

appellate review of sentencing decisions in the wake of *United States v. Booker*,

125 S.Ct. 738 (2005).  We assume for purposes of this case that if a district court

makes a mistake of law in consulting and applying the Guidelines, this mistake

would warrant a remand.  *Cf. United States v. Doe*, 398 F.3d 1254, 1257 n.5 (10th

Cir. 2005) ("[After *Booker*] appellate review continues to encompass review of

the district court's interpretation and application of the Guidelines.") We conclude

that the district court made no errors of law in its application of the Guidelines to

Mr. Riccardi.

Generally those convicted of possession of child pornography are sentenced

under U.S.S.G. § 2G2.4,[5] which commonly carries a base offense level of 15.  A

higher base offense level applies, however, when the defendant produced the

images he possessed.  U.S.S.G. § 2G2.4(c)(1) states: "If the offense involved

causing, transporting, permitting, or offering or seeking by notice or

advertisement, a minor to engage in sexually explicit conduct for the purposes of

---

[5] Effective November 1, 2004, § 2G2.4 was deleted by consolidation with §
2G2.2.  *See* U.S. Sentencing Guidelines Manual, App. C, amd. 664, at 41–53
(Supp. 2004).  Because the provision remained in effect at the time of Mr.
Riccardi's sentence, the amendment does not affect the outcome of this appeal.

producing a visual depiction of such conduct, apply § 2G2.1 . . . ." Section 2G2.1 carries a base offense level of 27.

Mr. Riccardi objects that his conduct that was used to apply this guideline was not criminalized at the time and is too removed in time to be "relevant conduct" for sentencing purposes. In this context, however, the passage of time does not diminish the relevance of the past conduct; the images Mr. Riccardi possesses today are the direct result of his enticement and exploitation of young men for the purpose of producing child pornography many years ago. *See United States v. Woodward*, 277 F.3d 87 (1st Cir. 2002) (allowing enhancement of a possession sentence due to conduct that had occurred more than two decades earlier). Nor does it matter that the possession of child pornography was not yet illegal at the time Mr. Riccardi made his photographs. He committed the offense on which he was convicted, possession of child pornography, after the conduct had been made criminal, and Congress, through the Sentencing Commission, is entitled to make the judgment that possession of child pornography produced by the defendant is an especially heinous species of that crime, regardless of when or where that production took place. As the Seventh Circuit has noted, "the cross-reference merely implements the common sense notion that a . . . possessor who manufactured the pornography in his possession is both more culpable and more dangerous than one who has received or possessed the pornography and no more."

*United States v. Dawn*, 129 F.3d 878, 884 (7th Cir. 1997).

**6.    Is the Sentence Invalid in light of *United States v. Booker*?**

Based solely on the facts reflected in the jury's verdict, the sentencing

range for Mr. Riccardi's offense would have been 57 to 71 months of

imprisonment.[6]  On April 17, 2003, the district court enhanced his sentence based

on facts found by a preponderance of the evidence.  First, the judge applied a

higher base offense level to the conviction on Count Two because Mr. Riccardi

had transported minors for the purpose of producing visual depictions of sexually

explicit conduct.  *See* U.S.S.G. § 2G2.4(c)(1) (directing the court to apply §

2G2.1 in these circumstances); *id.* § 2G2.1(a) (providing a base offense level of

27).  Second, the judge applied a two-point enhancement based on the factual

---

[6] The jury found Mr. Riccardi guilty of two counts of violating 18 U.S.C. §
2252(a)(4) and two counts of violating § 18 U.S.C. § 2422.  The base level for
these offenses, without considering information outside the jury verdict, is 15 for
violations of § 2252(a)(4), *see* U.S.S.G. § 2G2.4, and 10 for violations of 18
U.S.C. § 2422, *see id.* at § 2G1.1(c)(3); *id.* § 2A3.4(a)(3).  Based on the jury's
finding that Mr. Riccardi possessed more than 10 but less than 150 images, R.
Vol. V Doc. 129 at 2-3, the Guidelines would increase the base offense level for
Count Two by 2 points, to 17.  Under the multiple-count provision, the highest
base offense level would increase by 3, for a total offense level of 20.  *See id.* §
3D1.1 (procedure for determining offense level on multiple counts); *id.* § 3D1.4
(assigning one point to the most serious count, one point for each count within 4
levels of seriousness, and one-half point for each count 5 to 8 levels less serious).
Because the jury found that Mr. Riccardi engaged in prohibited sexual conduct on
at least two occasions with at least two minors, § 4B1.5(b)(1) provides a 5-point
enhancement, resulting in a base offense level of 25.  Accordingly, the jury
verdict authorizes a base offense level of 25, which, with Mr. Riccardi's criminal
history category of I, results in a range of 57 to 71 months.  *See id.* at § 5A.

finding that the victims of the count two conviction were between the ages of 12

and 16. *See id.* § 2G2.1(b)(1)(B). Finally, the judge increased the offense level

by three points based on the factual finding that there were three victims—Mr.

Rogers, Mr. Weller, and Mr. Grapes[7]—of the Count Two crime.[8] *See id.* § 3D1.4.

Together with a five-point enhancement for a pattern of activity involving

prohibited sexual conduct,[9] these enhancements resulted in a total offense level of

37, which provided an ultimate sentencing range of 210-262 months. At the

sentencing hearing, Mr. Riccardi objected to the district court's application of the

---

[7] Mr. Riccardi objected to the inclusion of Mr. Grapes as a victim in the calculation of his sentence because Mr. Grapes did not testify at trial. Mr. Riccardi argued that increasing his sentence on this ground would violate the Confrontation Clause. The district court overruled this objection because the Tenth Circuit determined in *United States v. Beaulieu*, 893 F.2d 1177, 1180 (10th Cir. 1990), that the Confrontation Clause does not apply when sentencing under the Guidelines.

[8] Had the district court applied the Guidelines using only the jury's verdict, this factual finding would not have made a material difference in Mr. Riccardi's sentence. The court's finding that there were three victims resulted in a three-point increase in the offense level because U.S.S.G. §2G2.1(c)(1) requires the court to treat each victim as a separate count for the purposes of multiple count adjustment. Had the district court applied the Guidelines to the jury verdict alone, Mr. Riccardi also would have had a three level increase in his offense level under the multiple count adjustment. *See supra* n. 7

[9] Mr. Riccardi contends that the five-point enhancement for engaging in prohibited sexual conduct was an impermissible factual finding by the judge. This argument is incorrect because it is clear from the verdict that the jury found Mr. Riccardi guilty of engaging in prohibited sexual conduct on at least two occasions with at least two victims, satisfying the requirements of U.S.S.G. § 4B1.5(1). *See* U.S. Sentencing Guidelines Manual, Application Note 4(b)(1).

Guidelines based on judicial fact-finding, contending that this was in violation of *Apprendi v. New Jersey*, 530 U.S. 446 (2000). In accordance with then-settled law, the district court overruled that objection, and entered a sentence at the top of the range, 262 months.

In imposing this sentence, the district judge stated:

> The court has considered the nature and circumstances of the offense, as well as the characteristics of the defendant, and believes that a sentence at the high end of the guideline range is appropriate based on the defendant's high degree of planning in the offenses, the time period covered by the offenses, and the number of victims not accounted for by his convictions. . . .
> . . .
> This sentence satisfies the sentencing objectives of punishment, deterrence, incapacitation, and rehabilitation.

Tr. 1192, 1194.

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court held that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Id.* at 756. To remedy this violation, the Court struck down those provisions of the Sentencing Reform Act that required mandatory application of the Guidelines, instead requiring district courts to consult them in an advisory fashion. *Id.* at 756-57 (excising 18 U.S.C. §§ 3553(b)(1), 3742(e)). Under *Booker*, therefore, the sentencing procedure in this

case was unconstitutional. The jury did not find, and the defendant did not admit, the facts on which the district court relied to enhance Mr. Riccardi's sentence pursuant to the mandatory Guidelines.

The government concedes that Mr. Riccardi's timely *Apprendi* objection adequately preserved his *Booker* argument, but it contends that the error was harmless. *See* Fed. R. Crim. P. 52(a); *United States v. Labastida-Segura*, 396 F.3d 1140, 1142-43 (10th Cir. 2005) (applying harmless error analysis to a preserved *Booker* error). Fed. R. Crim. P. 52(a) provides that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." In the context of a misapplication of the Guidelines under 18 U.S.C. § 3742(f)(1), the Supreme Court has held that "once the court of appeals has decided that the district court misapplied the Guidelines, a remand is appropriate unless the reviewing court concludes, on the record as a whole, that the error was harmless, *i.e.*, that the error did not affect the district court's selection of the sentence imposed." *Williams v. United States*, 503 U.S. 193, 203 (1992) (citing Fed. R. Crim. P. 52(a)); *see also Labastida-Segura*, 396 F.3d at 1142-43. In harmless error cases, where the error was preserved, the government bears the burden of demonstrating that the substantial rights of the defendant were not affected. *See Williams*, 503 U.S. at 203.

We agree with the government that the error here was harmless. Although

Mr. Riccardi objected to the sentence-enhancing fact-finding of the district court on *Apprendi* grounds, the evidence to support these factual findings was overwhelming. The jury found Mr. Riccardi guilty of possessing materials "which contained visual depictions of minors, the production of which involved the use of minors engaging in sexually explicit conduct, and which visual depictions were of such conduct and were produced using materials . . . transported in interstate or foreign commerce." R. Vol. V Doc. 129 at 1–2. The verdict form asked the jury to identify the trial exhibits that depicted sexually explicit conduct. Among the exhibits the jury identified as sexually explicit were Polaroid pictures numbered 1-182, 1-185, 1-196, 3-61, and 3-65. At trial, Mr. Rogers identified himself as the person in those Polaroid pictures and testified that he was about 13 years old at the time Mr. Riccardi took the pictures. Mr. Rogers testified that Mr. Riccardi would pick him up in Missouri and would they would "cross the river" to get to Mr. Riccardi's house where he would take pictures. Tr. 872. On cross-examination Mr. Riccardi attempted to impeach Mr. Rogers' credibility by asking him about his criminal history and questioning his ability to recall events that happened almost twenty years ago. Mr. Riccardi did not contest Mr. Rogers' testimony about being transported by Mr. Riccardi, his testimony that Mr. Riccardi took nude pictures of him, or Mr. Rogers' assessment of his age at the time Mr. Riccardi took the pictures.

The jury also identified the exhibits numbered 4-12 and 4-13 as sexually explicit. At trial, Mr. Weller identified himself as the subject of those pictures. Mr. Weller testified that Mr. Riccardi would pick him up at his grandparents' house and they would go to Mr. Riccardi's residence in Leawood for photo sessions. Mr. Weller also testified that after he moved out of his grandparents house to an apartment on the west side of Kansas City, Mr. Riccardi continued to transport Mr. Weller to his house in Leawood to take pictures. On cross-examination, Mr. Riccardi did not dispute Mr. Weller's testimony concerning the pictures or about being transported. Instead, Mr. Riccardi attempted to impeach Mr. Weller's testimony by getting him to admit that he lied about his age to Mr. Riccardi by telling him he was over 18.

The plethora of evidence supporting the district court's factual findings strongly suggests that these findings were correct. Moreover, the jury's verdict indicates that they found the testimony of Mr. Rogers and Mr. Weller to be credible. There is no reason to believe that if the factual issues of transporting minors for visual depiction of sexually explicit conduct, the ages of the victims, and whether there was more than one victim, had been submitted to the jury it would have found any differently than the district court. We also note that while Mr. Riccardi made a number of legal objections to the judge-found facts that increased his sentence, he did not challenge the factual basis of any of these

findings. Mr. Riccardi's decision not to contest these facts is another strong indication that the district court based the sentencing enhancements on Mr. Riccardi's actual conduct. *Cf. Booker*, 125 S.Ct. at 757 (the *Booker* remedy endeavors to maintain "a strong connection between the sentence imposed and the offender's real conduct").

Nor is there any reason to think that the district judge would have imposed a less severe sentence in the exercise of his post-*Booker* discretion. On the contrary, the district judge sentenced Mr. Riccardi at the top of the applicable Guideline range. *Cf. Labastida-Segura*, 396 F.3d at 1143 (holding that an error was not harmless where the district court sentenced at the bottom of the range). Having exercised his limited discretion under the pre-*Booker* system to give Mr. Riccardi the highest permissible sentence, there is no reason to think the judge would exercise his now-greater discretion to reduce the sentence. *See United States v. Bruce*, 396 F.3d 697, 720 (6th Cir. 2005) ("Surely, if the court was not inclined to impose a shorter sentence despite its power to do so within the guidelines' mandatory sentencing scheme, it would not have elected to reduce [the] sentence under a more open-ended advisory system."). Nor do the court's remarks at sentencing suggest anything other than a belief that the 262 month sentence was appropriate in light of all the circumstances.

Accordingly, we are satisfied that although the sentence was imposed in

violation of Sixth Amendment standards as set forth in *Booker*, the error did not violate Mr. Riccardi's substantial rights and must be disregarded.

## Conclusion

For the foregoing reasons, the rulings and judgment of the district court are AFFIRMED.