*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0123p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

                *Plaintiff-Appellant,*

    *v.*

RANDE H. LAZAR,

                *Defendant-Appellee.*

No. 08-5653

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 04-20017—Bernice B. Donald, District Judge.

Argued: December 4, 2009

Decided and Filed: May 4, 2010

Before: GRIFFIN and KETHLEDGE, Circuit Judges; CARR, Chief District Judge.[*]

_____

## COUNSEL

**ARGUED:** Stephen C. Parker, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellant. Orin S. Kerr, GEORGE WASHINGTON UNIVERSITY LAW SCHOOL, Washington, D.C., for Appellee. **ON BRIEF:** Stephen C. Parker, Kevin Whitmore, ASSISTANT UNITED STATES ATTORNEYS, Memphis, Tennessee, for Appellant. Orin S. Kerr, GEORGE WASHINGTON UNIVERSITY LAW SCHOOL, Washington, D.C., Steven E. Farese, Sr., FARESE, FARESE & FARESE, P.A., Ashland, Mississippi, Marc N. Garber, THE GARBER LAW FIRM, P.C., Marietta, Georgia, Daniel A. Clancy, CLANCY LAW FIRM, Jackson, Tennessee, for Appellee.

---

[*]The Honorable James G. Carr, Chief United States District Judge for the Northern District of Ohio, sitting by designation.

1

CARR, D. J., delivered the opinion of the court, in which GRIFFIN, J., joined. KETHLEDGE, J. (p. 18), delivered a separate concurring opinion.

———————————

**OPINION**

———————————

JAMES G. CARR, District Judge. This is an appeal from an order granting the defendant's motion to suppress evidence seized from two medical offices. Following the searches, a grand jury indicted the defendant, Dr. Rande H. Lazar, a pediatric otolaryngologist, on 110 counts of health care fraud. A superceding indictment charges him with devising and executing a scheme to defraud and obtain money from health care benefit programs.

The defendant contended in the District Court and argues in this Court: 1) the affidavit for the warrant did not establish probable cause; 2) the warrant did not meet the particularization requirement of the Fourth Amendment; 3) the government's claim of inevitable discovery has no merit; and 4) suppression is therefore appropriate.

The District Judge, agreeing with the defendant and adopting the Report and Recommendation of a United States Magistrate Judge [the reviewing Magistrate Judge], granted the defendant's motion to suppress, ordering exclusion of all evidence seized in the challenged searches.

For the following reasons, we affirm the decision of the District Court in part, and vacate in part.

**Standard of Review**

This Court reviews a district court's ruling on a motion to suppress for clear error on factual determinations, and *de novo* on legal determinations. *United States v. Adams*, 583 F.3d 457, 463 (6th Cir. 2009). "A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id*. (internal quotation and citation omitted). This Court reviews the evidence "in the

light most likely to support the district court's decision." *Id.* (internal quotation and citation omitted). Legal determinations reviewed *de novo* include determinations regarding the existence, or lack thereof, of probable cause. *United States v. Leake*, 998 F.2d 1359, 1362 (6th Cir. 1993).

## Background

A Magistrate Judge [the issuing Magistrate Judge] signed the warrants at issue on October 9, 2002, for searches of offices located at 777 Washington Avenue and 791 Estate Place, Memphis, Tennessee. The applications, affidavits and warrants were duplicates, except with regard to the addresses to be searched. The affiant was Tennessee Bureau of Investigation Special Agent/Criminal Investigator Donald F. Lee. Assistant United States Attorney [AUSA] Kevin Whitmore was with Agent Lee when Agent Lee presented the applications and affidavits to the issuing Magistrate Judge.

When submitted, the warrant applications included—as part of the affidavit— Attachment A, describing the premises to be searched, and Attachment B, captioned "Description of the Items to be Seized." Attachment B listed the items subject to seizure in eight paragraphs, stating, in summary:

1. "Any and all documents and records . . . including but not limited to patient charts, files, medical records . . . concerning the treatment of any of the below listed patients, claim forms, billing statements, records of payments received . . . for the following patients:";

2. "Any and all information and data, pertaining to the billing of services . . . .";

3. "Any and all computer hardware . . . .";

4. "Any and all computer software . . . .";

5.      "Any computer related documentation . . . .";

6.      "Any computer passwords . . . .";

7.      "If a determination is made during the search, by the Special Agent assigned to the computer aspect of this search, . . . that imaging or recreation of the computer hard drives will damage the seized information, you are authorized to seize the computers . . . ."; and

8.      "All other records or property that constitutes evidence of the commission of the offenses outlined in the search warrant . . . ."

In addition to the warrant applications, the supporting affidavits, Attachments A and B, and the warrants themselves, the "packet" submitted for the issuing Magistrate Judge's review included a list of patient names. [5/26/2005 Suppression Hearing Tr. 145] [Hearing Tr.].

According to the reviewing Magistrate Judge's Report and Recommendation advising suppression:

> AUSA Whitmore testified [at the suppression hearing] that he was present when the affidavits and applications, attachments A and B, and the warrants were presented to [the issuing Magistrate Judge]. Whitmore told the court [at the suppression hearing] that he created a list of names of specific patients for whom records were to be seized and gave the list to Agent Lee, who in turn presented it to the magistrate judge. Whitmore claimed [at the suppression hearing] that he and [the issuing Magistrate Judge] had a discussion concerning the patient list before the warrants were signed. The substance of this conversation is unknown; however, there was some indication by Whitmore that he discussed with [the issuing Magistrate Judge] the idea of not attaching the patient list to the affidavits and applications and the warrants out of concern that the names of minor children would be made public. In addition, Whitmore testified that at the time that Agent Lee was under oath, the patient list was a part of the search warrant package presented to the magistrate.

[Dist. Ct. Doc. 342, at 6-7].[1]

---

[1] The substance of the conversation between the issuing Magistrate Judge, AUSA Whitmore and Agent Lee is unknown for three reasons: 1) the issuing Magistrate Judge did not record the proceedings; 2) the reviewing Magistrate Judge sustained the defendant's objection to testimony by Whitmore at the

The reviewing Magistrate Judge first noted that "there were no patient names listed after the colon in paragraph one of Attachment B," and that the applications, affidavits, and warrants, which incorporated the affidavits, did not include any patient-specific identifiers. [*Id.* at 7].

---

suppression hearing about his conversation with the issuing Magistrate Judge about the patient list; and 3) the reviewing Magistrate Judge also refused the government's request to call the issuing Magistrate Judge. [Hearing Tr. 139-45, 169-70].

    The reviewing Magistrate Judge refused to permit Whitmore to testify because she perceived his testimony about patient files to be offered as "oral supplementation" [*Id.* at 145] that she would not consider "in determining whether there was probable cause to issue the warrant." [*Id.* at 143]. This was so because Whitmore was not under oath when before the issuing Magistrate Judge, and "any oral supplementation would have to be under oath or affirmation." [*Id.* at 145].

    The reviewing Magistrate Judge also declined to permit the government to call the issuing Magistrate Judge, because she perceived that he would be asked about "matters he considered" in issuing the warrants. [*Id.* at 170].

    This exclusion of "the discussion about the patient files" was erroneous. That testimony likely would have explained why the patient list was not attached to the warrants when issued: "[T]here was a discussion as relates to the concerns of the privacy issue concerning these children, that if it were to remain a part of the public record that it would be put in the public domain. And it was at that point there was a discussion whereby it was not part of the permanent record." [*Id.* at 164].

    His testimony thus likely would not have related to the issue of probable cause for the warrant, but to the administrative matter of why the patient list was not attached to the warrants. Rule 41 of the Federal Rules of Criminal Procedure does not require an individual to take a preliminary oath before describing what happened after a warrant issued. There was no basis, therefore, for the reviewing Magistrate Judge to exclude evidence about why the patient lists became detached from the warrants when the lists were in front of the issuing Magistrate Judge at the time he issued the warrants.

    Despite the error in excluding testimony at the suppression hearing about the conversation between the issuing Magistrate Judge, Whitmore and Agent Lee, reversal on that basis is improper for three reasons. First, Whitmore failed to point out to the reviewing Magistrate Judge that he was not offering his own testimony to supplement the probable cause showing, but rather to show what happened to the patient list after the warrants issued. Second, Whitmore did not point out that the issuing Magistrate Judge's testimony would not have related to the Magistrate Judge's thought processes, but simply to whether the warrant package included a patient list, and if so which list. Third, Whitmore failed to make a proffer of the contents of his or the issuing Magistrate Judge's testimony, except to indicate that it was about the patient lists.

The reviewing Magistrate Judge's Report and Recommendation, however, made no finding as to which, if any, patient lists came before the issuing Magistrate Judge.[2] It instead focused on the absence of any *original* patient lists at the suppression hearing:[3]

> During the course of AUSA Whitmore's testimony [at the suppression hearing], it was discovered that there were several patient lists in existence. *See* Exh. 6a, 6b, 6c, 10, and 15. *None of the lists entered into evidence at the hearing were the actual list presented to the magistrate and none of them were identical.* In fact, AUSA Whitmore

[2]This is problematic due to the numerous patient lists in the record and our determination, see *infra*, that whichever patient list the issuing Magistrate Judge saw particularized the search warrants in part.

The parties submitted eight lists at the suppression hearing:

- Exhibit 6a was an alphabetical list of 125 patients (with patient file numbers written on it by the defendant's staff member on the date of the search), which Whitmore testified "was a list of patients that I developed from a – that I reduced to a letter-size for the purpose of presenting it to the agent and it would be presented to the judge, part of the search warrant application" [Hearing Tr. 147];

- Exhibit 6b, captioned "Lazar Search Warrant by Patient Name," was an alphabetical list of patients *different from those listed in Exhibit 6a*; and

- Exhibit 6c, captioned "Lazar Search Warrant by Date of Service," contained the same names as listed in Exhibit 6b, but sorted by dates of "service" (*i.e.*, treatment by the defendant).

- Exhibit 8: an inventory of sixty-eight patient files seized during the search of 777 Washington Avenue [Hearing Tr. 66], thirty-one individuals from Exhibit 6a, thirty-six from Exhibits 6b and 6c, and one individual on none of the lists;

- Exhibit 10: a patient list—the one used during the search of 777 Washington Avenue according to Agent Geasley [*Id.* at 76]—of sixty-eight patient files consisting of the same individuals as Exhibits 6b and 6c;

- Exhibit 12: an inventory of, *inter alia*, sixty-nine patient files and sixty CATSCAN films seized during the search of 791 Estate Place [*Id.* at 116-18]; all of these files and films belong to patients listed in Exhibit 6a except for eight, four of which come from Exhibits 6b and 6c, and four of which are of individuals on none of the lists;

- Exhibit 13: an inventory list identical to Exhibit 12 but less detailed and more narrowly spaced; and

- Exhibit 15: a list of patient names—consisting of the same individuals as Exhibit 6a—attached as Attachment A to the government's response to the defendant's motion to suppress and represented by Whitmore to be the "working copy" of the patient list used. [Hearing Tr. 156-59].

[3]To the extent that the reviewing Magistrate Judge was concerned about the absence of the original list given to the issuing Magistrate Judge, her concerns were not well-founded. As noted in *United States v. Posey*, 501 F.2d 998, 1002 (6th Cir. 1974), a court may consider a duplicate (in that case, of a missing affidavit), even one that contains later-added material, when determining whether a search warrant lawfully issued.

testified that he did not have copy of the original patient list that was presented to the magistrate judge. Whitmore referred to the patient list attached to the government's response to the present motion as a "working copy" and stated the attached copy was not the one presented to the magistrate judge. Nor are there any patient lists in the clerk's files [containing the search warrants].

[*Id*. at 7-8] (emphasis added).

The reviewing Magistrate Judge avoided determining which patient list came before the issuing Magistrate Judge because she believed it did not matter: "The fact that the [issuing] magistrate judge may have viewed a patient list before signing the warrants does not save the warrants from its [sic] facial invalidity." [*Id.* at 12].

The reviewing Magistrate Judge also found that the warrants lacked probable cause to believe that patients' medical records would be in the defendant's medical offices.

Reviewing the Report and Recommendation, the District Judge—without allowing argument or further supplementation of the record[4]—adopted the reviewing Magistrate Judge's recommendation that the evidence be suppressed. [Dist. Ct. Doc. 506]. The District Judge made no further finding as to any patient list presented to the issuing Magistrate Judge.

## Discussion

### I. The Search Warrants Incorporated Any Patient List
### Presented to the Issuing Magistrate Judge

The reviewing Magistrate Judge held that the language of the first paragraph of Attachment B did not suffice to incorporate a patient list into the affidavit and warrants.

---

[4] The District Judge rejected the government's request that she conduct a further hearing and consider additional evidence. In light of the confusing nature of the various and conflicting pieces of evidence presented to the reviewing Magistrate Judge, it would have been preferable for the District Judge to have granted the parties a hearing at which to clarify and expand the record. Had such a hearing occurred, this appeal and our remand may not have been necessary.

That conclusion, however, is incorrect. "Incorporation" of one thing into another need not be by express "reference." *Cf. Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1346 (Fed. Cir. 2008) (no "magic words" needed to incorporate one document into another); *Resolution Trust Corp. v. Fed. Sav. and Loan Ins. Corp.*, 25 F.3d 1493, 1499 (10th Cir. 1994) ("Phrases such as 'incorporated by reference' are not talismanic, without which we do not consider additional necessary documents that effectuate the parties' agreement.").

Here, the first paragraph of Attachment B gave sufficient direction when it referred to "the below listed patients" and "the following patients." Any patient list presented to the issuing Magistrate Judge thus was effectively incorporated into the search warrants. If the record otherwise shows that the government seized patient files according to the list, if any, presented to the issuing Magistrate Judge, a lack of formal incorporation by reference into the warrants does not justify a finding of facial insufficiency.

## II. Suppression of Patient Records Seized Beyond the Scope of Whichever List Came Before the Issuing Magistrate Judge Is Required Under *Groh v. Ramirez*

The Supreme Court's decision in *Groh v. Ramirez*, 540 U.S. 551 (2004), rather than its more recent, but less on point, decision in *Herring v. United States*, --- U.S. ----, 129 S. Ct. 695, 698 (2009), controls, and requires suppression of all patient records seized beyond the scope of any patient list presented to the issuing Magistrate Judge.

In *Groh*, a law enforcement officer prepared a search warrant and affidavit for a Magistrate Judge's approval. The search warrant "failed to identify any of the items that [the agent] intended to seize." 540 U.S. at 554. The warrant also failed to "incorporate by reference the itemized list contained in the application [affidavit]. It did, however, recite that the Magistrate was satisfied the affidavit established probable cause[.]" *Id.* at 554-55. The Magistrate Judge subsequently signed the defective warrant.

Discussing the constitutionality of the search, the Supreme Court observed: "Even though petitioner acted with restraint in conducting the search, 'the inescapable

fact is that this restraint was imposed by the agents themselves, not by a judicial officer.'" *Id.* at 561 (quoting *Katz v. United States*, 389 U.S. 347, 356 (1967)).

The Court concluded that, "[b]ecause [the officer] did not have in his possession a warrant particularly describing the things he intended to seize, proceeding with the search was clearly unreasonable under the Fourth Amendment." *Id.* at 563. In so deciding, the Court stated:

> [U]nless the particular items described in the affidavit are also set forth in the warrant itself (or at least incorporated by reference, and the affidavit present at the search), there can be no written assurance that the Magistrate actually found probable cause to search for, and to seize, every item mentioned in the affidavit.

*Id.* at 560.

Quoting its prior decision in *United States v. Leon*, 468 U.S. 897, 923 (1984), the Supreme Court further held that the good faith exception[5] did not apply: "'[A] warrant may be so facially deficient – *i.e.*, in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid.' This is such a case." *Groh*, 540 U.S. at 565.

The Supreme Court's recent decision in *Herring* does not question this statement of law.

In *Herring*, an individual sought to retrieve an item from his impounded truck. From a warrant check on the individual, an officer learned that a warrant for the individual's arrest was outstanding. Acting on that information, the officer arrested and searched the individual, finding drugs and an unlawfully possessed firearm.

There was, however, no outstanding warrant. The warrant about which the officer had been notified had, in fact, been withdrawn. Through a clerical error, the warrant had

---

[5]The good faith exception to the exclusionary rule applies when "the officer conducting the search acted in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate that subsequently is determined to be invalid." *Leon*, 468 U.S. at 922-23.

not been cleared from the system. Had the warrant been properly cleared, the officer would not have arrested or searched the individual.

The Court stated that, to require exclusion in such circumstances, the error by the police must be "reckless or deliberate." 129 S. Ct. at 700. This is because "the benefits of deterrence must outweigh the costs" to justify exclusion of evidence, and the possible deterrence of negligent action by law enforcement does not rise to a level sufficient to trigger exclusion of evidence. *Id.* The Court stressed that the question of suppression "turns on *the culpability of the police* and the potential of exclusion *to deter wrongful police conduct*." *Id.* at 698 (emphasis added); *see also United States v. Calandra*, 414 U.S. 338, 348 (1974) (explaining that the exclusionary rule is "designed to safeguard Fourth Amendment rights generally through its *deterrent* effect" (emphasis added)).

This case does not involve the sort of police error or misconduct present in *Herring*. Like *Groh*, it instead deals with particularization of search warrants and whether they are facially deficient. Despite the government's argument to the contrary,[6] *Herring* does not purport to alter that aspect of the exclusionary rule which applies to warrants that are facially deficient warrants *ab initio*.[7]

Here, the warrant was particularized insofar as it described—and thus allowed seizure of— patient records based on any patient list that came before the issuing Magistrate Judge. Suppression of patient files seized pursuant to any such list was therefore erroneous, and reversal of that decision is appropriate. *See United States v.*

---

[6] *See* 11/24/2009 Government's Letter to this Court Regarding Supplemental Citations ("The United States submits the Supreme Court's decision in *Herring v. United States*, --- U.S. ----, 129 S.Ct. 695, 699-700, 172 L.Ed.2d 496 (2009), greatly expanded the Good Faith Expansion [sic] and has changed the applicable standard in determining if the Good Faith exception applies if an [sic] search warrant lacks particularity.").

[7] The government points to the Tenth Circuit's decision in *United States v. Otero*, 563 F.3d 1127 (10th Cir. 2009), to support its argument. That decision, however, does not do so. 563 F.3d at 1134 (citing *Leon* and applying the "pre-*Herring* precedent hold[ing] that a warrant may be so facially deficient . . . that the executing officers cannot reasonably presume it to be valid" (internal quotation omitted)); *see also United States v. Potts*, 586 F.3d 823, 832-33 (10th Cir. 2009) (quoting *Otero* and *Leon*).

At oral argument, the government asserted that the Ninth Circuit's decision in *United States v. SDI Future Health, Inc.*, 553 F.3d 1246 (9th Cir.), *superseded by* 568 F.3d 684 (9th Cir. 2009), justifies reversal on the particularization issue. Timeliness of the government's argument aside, *SDI Future Health* does not persuade us that the District Court was in error. 568 F.3d at 706 (applying a *Leon* objective reasonableness analysis, as well as unique Ninth Circuit precedent, and finding a warrant in a health care fraud investigation to fail particularization, irrespective of the presence of an allegedly curing affidavit).

*Johnson*, 351 F.3d 254, 260 (6th Cir. 2003) ("[I]nfirmity of part of a warrant requires the suppression of evidence seized pursuant to that part of the warrant  .  .  . , but does not require the suppression of anything described in the valid portions of the warrant[.]" (internal quotation and citation omitted)).

As regards records of patients whose names did not appear on a patient list presented to the issuing Magistrate Judge, the facts of this case mirror those in *Groh* and require suppression of those files. This facial deficiency was so evident, moreover, that no officer could reasonably presume the warrants valid.

Because the District Court did not make a finding as to which patient list came before the issuing Magistrate Judge, however, we cannot yet determine exactly which patient records should have been suppressed.

We therefore vacate the District Court's suppression of defendant's patient files with instructions for the District Court to determine which list—if any—came before the issuing Magistrate Judge, and to suppress only patient files seized beyond the scope of such list.

### III. Suppression of the Non-Patient File Evidence is Proper

The reviewing Magistrate Judge also recommended that all non-patient file evidence be suppressed, and the District Court did so.

We have held that "[f]ailure to limit broad descriptive terms by relevant dates, when such dates are available to the police, will render a warrant overbroad." *United States v. Ford*, 184 F.3d 566, 576 (6th Cir. 1999).

Here, the reviewing Magistrate Judge reasoned: "Rather than specify exactly which documents it was seeking, the government chose to use descriptions of items to be seized that referenced no specific patients, no specific transactions, and most importantly, no time frame." We agree with the District Court's decision in this regard.

We therefore affirm the District Court's suppression of the non-patient file evidence.[8]

## IV. The Inevitable Discovery Doctrine is Inapplicable

The government argues in the alternative that the inevitable discovery doctrine prevents suppression of the evidence.

The doctrine of inevitable discovery allows admission of unlawfully obtained evidence if the government can "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). To establish inevitable discovery, the government must show that the evidence would have been acquired lawfully through an independent source absent the government misconduct. *Id.* at 448.

The government claims that it would have obtained the files suppressed by the District Court through use of a Department of Justice or grand jury subpoena. It points out that it had already used a subpoena to inspect some of the defendant's records. It asserts that it resorted to search warrants to diminish the risk that, if it subpoenaed the files, the defendant might either decline to produce or alter the subpoenaed files.

Complications can readily arise from use of a subpoena. As the Second Circuit stated in *United States v. Roberts*, 852 F.2d 671, 676 (2d Cir. 1988):

> The mere fact that the government serves a subpoena, however, does not mean that it will obtain the documents it requests. A subpoena can be invalid for a variety of reasons, as when it is unduly burdensome, when it violates the right against self-incrimination, or when it calls for privileged documents. Moreover, we can deplore but not ignore the possibility that the recipient of a subpoena may falsely claim to have lost or destroyed the documents called for, or may even deliberately conceal or destroy them after service of the subpoena.

---

[8]This includes the "Attorney Information" files, a file containing Medicare/Medicaid claims for six years, three backup tapes containing billing information, and the mirror-image of a computer hard drive.

*Accord Ctr. Art Galleries-Hawaii, Inc. v. United States*, 875 F.2d 747, 754-55 (9th Cir. 1989) (following *Roberts*).[9]

The government, citing *United States v. Keszthelyi*, 308 F.3d 557 (6th Cir. 2002), *United States v. Ford*, 184 F.3d 566 (6th Cir. 1999), and *United States v. Stamper*, 91 F. App'x 445 (6th Cir. 2004) (unpublished disposition),[10] contends that the Sixth Circuit takes a different, and less demanding, approach to the inevitable discovery exception.

This Court has held that "the inevitable discovery exception to the exclusionary rule applies when the government can demonstrate either the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or *other compelling facts* establishing that the disputed evidence inevitably would have been discovered." *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995) (emphasis added).

In *Ford*, this Court stated: "The government can satisfy its burden by showing that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence." 184 F.3d at 577. Though some speculation as to how events would have unfolded, absent an illegal search, may be necessary, "we must keep speculation at a minimum by focusing on *demonstrated historical facts* capable of ready verification or impeachment." *Id.* (quotation omitted) (emphasis added); *see also Keszthelyi*, 308 F.3d at 574.

---

[9] Even where challenges on the basis of breadth, burdensomeness or privilege are not successful, they are commonplace and result, at best, in delay and uncertainty. Oftentimes, delay, not discovery, is an inevitable consequence of serving a subpoena.

[10] *Stamper* does not, as the government contends, endorse the use of a subpoena as a way around the consequences of unconstitutional conduct. The issue of inevitable discovery in that case involved learning the identity of a witness found in a motel room which officers had entered unlawfully to arrest the defendant. The court held that the officers would have learned the witness's identity from motel registration regardless of the unlawful entry, and that they then could have procured her testimony by subpoena. 91 F. App'x at 459. What was to be discovered inevitably was a record, made by and located in the hands of a third party. Even if the officers had not entered the room, the record would have led them to the witness. The ensuing evidence—the witness's testimony —would have come from the witness, rather than the defendant. The defendant in *Stamper*, in contrast to the defendant here, thus controlled none of the sources of information or evidence on which the government in that case based its claim of inevitable discovery.

A court assesses the likelihood that "routine procedures" would have led inevitably to acquisition of the evidence as of the time of the unlawful search. *United States v. Alexander*, 540 F.3d 494, 502 (6th Cir. 2008) (holding that a court is "to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred").

The record in this case shows that the government had used third party subpoenas during its investigation before seeking the warrants, and the government represented that it had reason to believe that if it continued to do so, at least regarding Dr. Lazar's records, he would likely attempt to alter those records. [Dist. Ct. Doc. 153, at 17]. That concern appears to have prompted the government to get the search warrants.

The record does not show that the government, at the time it obtained the warrants, concurrently contemplated issuing subpoenas for any records in Dr. Lazar's possession. The government's brief talks a good bit about how common subpoenas are in health care fraud and other white collar investigations. The government, however, presents no *evidence* establishing that it likely would have sought to acquire Dr. Lazar's records by subpoena, much less procured them in the same condition and as promptly as by seizing them with a warrant.

Even if the government need not show that it would likely have obtained the records as quickly and completely with a subpoena, it must at least show that it was ready to obtain them in that manner if, for any reason, it could not have done so—or would have chosen not to do so—with a search warrant. *See Roberts*, 852 F.2d at 676.

As the Second Circuit stated in *United States v. Eng*, 971 F.2d 854, 860-61 (2d Cir. 1992):

> In view of the need to prevent the inevitable discovery exception from swallowing the exclusionary rule, special care is required on the part of a district court when the government relies on the subpoena power. While we decline to draw a bright line, it is essential that there be a substantial degree of directness in the government's chain of discovery argument, rather than a hypothesized "leapfrogging" from one subpoena recipient to the next until the piece of evidence is reached. Further, the

government must show that both issuance of the subpoena, and a response to the subpoena producing the evidence in question, were inevitable. Particular care is appropriate where, as here, subpoenas are issued after or at the time of the unlawful search, an issue that *Roberts* did not present. We share the Ninth Circuit's view that subpoenas must not serve as an after the fact "insurance policy" to "validate" an unlawful search under the inevitable discovery doctrine. *See Center Art Galleries*, 875 F.2d at 755.

Most simply put, here, as in *Ford*, "the record does not substantiate the government's claim that it was hot on the trail of the disputed evidence. The government has not carried its burden of proving the inevitability of discovery." 184 F.3d at 578.

The government asks us, in effect, to find that discovery—*i.e.*, acquisition—of the suppressed evidence was inevitable simply because the law allows subpoenas to issue. Were we, or any court, to accept this contention, the mere possibility that a subpoena could or might issue would always trump suppression.

We conclude, accordingly, that the government did not meet its burden of showing that, despite the partial invalidity of the warrants, retrieval of the unconstitutionally seized set of patient files and records was inevitable, whether by means of a subpoena or otherwise.

### V. Probable Cause Supported the Warrants

The District Court found, and the defendant argues, that the warrants lacked probable cause to believe that the patients' medical records would be found in the defendant's medical offices.

We reverse the District Court's finding on this issue.

In making a probable cause determination, an issuing Magistrate Judge's task is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). A court reviewing an issuing Magistrate Judge's

determination, moreover, is to pay "great deference" to the Magistrate Judge's finding of probable cause, and should uphold a warrant so long as the Magistrate Judge had a "substantial basis for . . . concluding that a search would uncover evidence of wrongdoing." *Leake*, 998 F.2d at 1363 (internal quotations and citations omitted).

In *United States v. Word*, this Court held that where individuals are patients of a physician, "probable cause exist[s] for believing that their medical records would be located at the [physician]'s office." 806 F.2d 658, 662 (6th Cir. 1986).

In light of *Gates*, *Leake* and *Word*, here Agent Lee's affidavit in the warrant applications provided a foundation for a common sense determination that there was a fair probability that evidence of health care fraud—namely, the defendant's patient files and records—would be found at the defendant treating physician's offices.

This foundation stemmed from the connection Agent Lee drew between the defendant and the offices in question. Agent Lee based his affidavit on his personal, two-year involvement in the case; the basis for his conclusion included his: 1) personal visits to each location and photographs thereof at Attachment A of each warrant; 2) review of the defendant's billing data and hospital records; and 3) interviews of the defendant's former office administrator, the defendant's former medical partners, and insurance company representatives.

We accordingly hold that Agent Lee's affidavit and photographs provided the issuing Magistrate Judge with a substantial basis to find probable cause to believe that the patient files and records would be found at the defendant's offices at the locations specified. The District Court's determination to the contrary was in error.[11]

---

[11]Defendant argues also that the government violated 18 U.S.C. § 3731, which requires that the "United States Attorney certif[y] to the district court that the appeal is not taken for purpose of delay and that the evidence [suppressed] is a substantial proof of a fact material in the proceeding." Defendant alleges that this violation occurred when Whitmore—an AUSA and witness in the case below—signed the government's certification to appeal this case, thus circumventing the statute's intended "conscientious pre-appeal analysis." *United States v. Smith*, 263 F.3d 571, 577 (6th Cir. 2001) (internal quotation and citation omitted).

Defendant's argument is not well taken. As the government points out, United States Attorney's Offices must obtain permission to appeal adverse rulings to the U.S. Courts of Appeals: The Criminal Division of the Department of Justice reviews the case and prepares a memorandum for the Solicitor General of the United States, who makes the final decision on whether to appeal.

As to defendant's contention that certification signed by an AUSA such as Whitmore—as

## Conclusion

For the foregoing reasons, we **AFFIRM** in part and **VACATE** in part the District Court's decision to suppress the evidence seized from the defendant's offices, and **REMAND** to the District Court for proceedings consistent with this opinion.

---

opposed to the United States Attorney—cannot satisfy § 3731, we reject such a requirement, especially in light of the review process outlined above. *Accord United States v. Smith*, 532 F.2d 158, 160 (10th Cir. 1976); *United States v. Wolk*, 466 F.2d 1143, 1146 n.2 (8th Cir. 1972).

These conclusions, moreover, are particularly appropriate given § 3731's mandate that "[t]he provisions of this section shall be liberally construed to effectuate its purposes."

―――――――――――――

**CONCURRENCE**

―――――――――――――

KETHLEDGE, Circuit Judge, concurring.  I join the court's opinion, and make a further observation.  One of the many remarkable aspects of this case is that one of the government's lawyers called himself as a witness in the district court and then proceeded to write and sign a brief to this court.  The lawyer acted, I am sure, in good faith; but as a result of his dual status, our task has been hampered throughout by the need to sift his sworn testimony in the district court from his unsworn testimony in his brief.  *Pro se* cases excepted, counsel should avoid this sort of thing.  Once a lawyer gets into a case as a witness, he ought to get out of it as an advocate.