NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0423n.06

No. 10-4240

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Jun 28, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellee*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| v. | ) | DISTRICT OF OHIO |
| | ) | |
| MICHAEL GODFREY, | ) | **O P I N I O N** |
| | ) | |
| *Defendant-Appellant*. | ) | |
| | ) | |

BEFORE: COLE, CLAY, and GILMAN, Circuit Judges.

**COLE, Circuit Judge.** Defendant-Appellant Michael Godfrey appeals the denial of his motion to suppress a firearm seized during a *Terry* stop. For the following reasons, we **AFFIRM**.

**I.**

Early in the afternoon of February 19, 2009, Officer Chris Perry, an agent with the Regional Enforcement Narcotics Unit of the Hamilton County Sheriff's Office, approached a four-way stop sign in the Over-the-Rhine neighborhood in Cincinnati, Ohio. Godfrey was stopped at that intersection in his vehicle as Perry arrived. Although Godfrey had the right of way, he motioned for Perry to proceed first. Perry, suspicious of this apparent act of kindness in an area where he believes residents distrust the police, declined and indicated that Godfrey should go first. Godfrey acceded, followed by Perry and another agent driving behind Perry, Officer Timothy Nash. As Perry began

following Godfrey, he radioed Godfrey's license plate to Nash, so that Nash could run a warrant check while Perry focused on keeping Godfrey's vehicle in sight. Nash followed.

However, Nash "made a typographical error [when] entering [Godfrey's] license number into the mobile data terminal ('MDT') in his patrol car." (Order, Dist. Ct. Docket No. 30, at 2; *see also* Suppression Hr'g Tr., Dist. Ct. Docket No. 32, at 35.) Instead of entering in license plate number "EAD7669," which belonged to Godfrey, Nash entered "EAD7769," the plate number of a vehicle belonging to Neal Ramey. As soon as he entered the (wrong) license plate number into the MDT, Nash received an audible (a "high-low tone") and visible (the screen turning red) warning indicating the vehicle's owner had an outstanding warrant. Because Perry was working with Nash that afternoon, Perry's MDT system was linked to Nash's, and Perry received alerts from Nash's MDT.

At this point, Godfrey turned onto another street in front of several cars, putting several vehicles between him and the officers. Because they were concerned with catching up with Godfrey and weaving through traffic to do so, neither Nash nor Perry "scroll[ed] through [the] several more screens" that would be required to discover the identity and description of the individual and vehicle for which the alert sounded. (Order, Dist. Ct. Docket No. 30, at 3.) Also, it does not appear that Perry's MDT would have allowed him to access any information on the individual associated with the alert, but this is somewhat unclear from the record. (*See id.* at 7; Suppression Hr'g Tr., Dist. Ct. Docket No. 32, at 61. *But see* Suppression Hr'g Tr., Dist. Ct. Docket No. 32, at 19-20.)

Once Perry and Nash activated their lights and caught up with Godfrey, Godfrey pulled over to the curb, and the officers pulled over behind him. Perry immediately exited his vehicle to secure Godfrey, and Nash left his vehicle simultaneously to provide Perry with backup. Perry approached

Godfrey and asked to see his driver's license. In response, Godfrey admitted that his license was suspended. Shortly thereafter, Perry entered Godfrey's information into Perry's MDT to verify that Godfrey's license was suspended, which it was.

A third agent then arrived, Officer Ryan Hudson, and the officers put Godfrey in the back of Hudson's police car so they could impound his vehicle. Meanwhile, the officers received consent from Godfrey to search his vehicle and found inside the vehicle a firearm with the serial number filed off. The officers subsequently transported Godfrey to the police station, where he was questioned and arrested with regard to the firearm.

The government prosecuted Godfrey for being a felon-in-possession of a firearm. Godfrey moved to suppress the firearm, but the district court denied his motion after a hearing. Godfrey then pled guilty, reserving his right to appeal the denial of his suppression motion. Godfrey received a sentence of one day of imprisonment followed by three years of supervised release. Godfrey timely appealed the denial of his motion to suppress.

## II.

In examining the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law de novo. *United States v. Foster*, 376 F.3d 577, 583 (6th Cir. 2004). We must view the evidence "in the light most likely to support the district court's decision." *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999) (internal quotation marks omitted). Although, "in affirming a denial of a motion to suppress, we need not rely on the ground[] set forth by the district court," *United States v. Pasquarille*, 20 F.3d 682, 685 (6th Cir.

1994), that basis (the good faith exception) is adequate here, so we do not reach the government's newly-advanced argument that reasonable suspicion justified the stop.

Because Godfrey concedes that his detention was lawful after he admitted to driving under a suspended license, and that he consented to the search of his vehicle, our inquiry centers around whether the good faith exception cured the alleged unconstitutional infirmity of the stop. Yet our focus is even narrower, for Godfrey does not contend that Nash's mistyping of the license plate was anything more than accidental. We must therefore determine simply whether "good faith" justifies the officers' failure to scroll through the several screens and confirm the details of the warrant before intruding on Godfrey's Fourth Amendment right to be free from unreasonable searches and seizures.

Where we find—or a party concedes—that a search is unconstitutional, the typical remedy is suppression of the evidence seized. *Herring v. United States*, --- U.S. ---, 129 S. Ct. 695, 699 (2009). However, exclusion is not always proper; instead, it "applies only where it results in appreciable deterrence." *Id.* at 700 (internal quotation marks omitted). In making this determination, we "must consider the actions of all the police officers involved," *id.* at 699, assess "the efficacy of the [exclusionary] rule in deterring Fourth Amendment violations in the future," *id.* at 700, and analyze whether "the benefits of deterrence . . . outweigh the costs" to the justice system of letting culpable individuals go free, *id.* at 700-01. Further, the Supreme Court has explained that where, as here, police personnel are responsible for the unconstitutional error, suppression is necessary only if the police conduct is "deliberate, reckless, or grossly negligent . . . , or in some circumstances [due to] recurring or systemic negligence." *Id.* at 702.

*Herring* formed the basis of the district court's conclusion, so we begin with an examination of that decision. In *Herring*, the Supreme Court faced a situation where an individual went to a police station to retrieve an item from his impounded truck. *Id.* at 698. The officers ran a warrant check on the individual, and the neighboring county's warrant clerk told the officers that the individual had an outstanding warrant. *Id.* The officers then arrested the individual and found drugs and a firearm on his person. *Id.* Yet there was, in actuality, no arrest warrant outstanding; the warrant had been recalled five months earlier, though, "[f]or whatever reason," no one had cleared it from the warrant database. *Id.* Applying the good faith standard, the Court in *Herring* held that the exclusionary rule did not apply to bar evidence seized after an accidental police error. *Id.* at 704.

We have since expounded on *Herring*'s effect on the exclusionary rule: "The Supreme Court has effectively created a balancing test by requiring that in order for a court to suppress evidence following the finding of a Fourth Amendment violation, 'the benefits of deterrence must outweigh the costs.'" *United States v. Master*, 614 F.3d 236, 243 (6th Cir. 2010) (quoting *Herring*, 129 S. Ct. at 700). We explained further that "the *Herring* Court's emphasis seem[ed] weighed more toward preserving evidence for use in obtaining convictions, even if illegally seized, than toward excluding evidence in order to deter police misconduct unless the officers engage in 'deliberate, reckless, or grossly negligent conduct.'" *Id.* (quoting *Herring*, 129 S. Ct. at 702).

The district court applied *Herring*'s approach here and found no justification to exclude the evidence. We agree. Nash's initial data-entry error was a mistake and at most constituted typical negligence of the sort present in *Herring*. *See Herring*, 129 S. Ct. at 698, 704. And Godfrey does not argue, nor is there evidence in the record independently establishing, that Hamilton County

officers make these sorts of typographical errors recurrently or systemically. *See id.* at 703 ("If the police have been shown to be reckless in maintaining a warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests, exclusion would certainly be justified . . . ."). Accidental typographical mistakes are not the sort of police behavior that suppression would deter, so the exclusionary rule does not require suppression for this error.

Once the error occurred and the officers learned of the outstanding warrant, the second purported police error—and the one Godfrey contends was "reckless" or "deliberate"—was the officers' failure to verify that the information conveyed to Nash on his MDT matched Godfrey's person and vehicle. But, as the district court noted, accessing this information would have required scrolling through several screens on Nash's MDT touch screen, and the district court found—based on Nash's testimony—that Perry did not have access to this information at all. We believe the decision not to scroll through the MDT screens while weaving in and out of traffic and pursuing Godfrey was reasonable, because the officers were concerned with driving safely and not losing Godfrey, who in their view was trying to put distance between himself and the officers. After stopping Godfrey, Nash did not scroll for further information on his screen because Perry wanted to secure the vehicle and the individual for whom they thought a warrant was outstanding, and Nash had to provide Perry with backup for Perry's safety.

These actions and the officers' concerns for road and officer safety, as well as a perceived need for swift apprehension of the wanted individual, reasonably explained the officers' failure to double-check the MDT system before securing the suspect and his vehicle. This oversight constituted negligence at most, and there is no reason to believe that suppression in such

circumstances would deter similar mistakes in the future. Moreover, because there is no evidence that such errors are commonplace or systemic, the good faith exception militates in favor of "preserving evidence for use in obtaining convictions, even if illegally seized, [rather] than toward excluding evidence in order to deter police misconduct." *Master*, 614 F.3d at 243. As such, the good faith exception cures any unconstitutional police action here.

Godfrey's reliance on *Groh v. Ramirez*, 540 U.S. 551 (2004), for a contrary result, is misplaced, because that decision entailed unreasonable reliance on a facially-invalid warrant. In *Groh*, the search warrant on which the officers relied to search the defendants' ranch "failed to identify any of the items that [the officers] intended to seize." *Id.* at 554-55. Rejecting the argument that the resultant search was constitutional or undertaken in "good faith," the Court explained: "[A] warrant may be so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid. This is such a case." *Id.* at 565 (internal quotation marks omitted). Here, by contrast, the officers did not examine a facially-invalid warrant, but instead at most negligently failed to examine a facially-valid, if inapplicable, warrant. *Herring* thus guides our determination that the good faith exception saves the officers' action. *See United States v. Lazar*, 604 F.3d 230, 236 (6th Cir. 2010) ("This case does not involve the sort of police error or misconduct in *Herring*. Like *Groh*, it instead deals with particularization of search warrants and whether they are facially deficient. Despite the government's argument to the contrary, *Herring* does not purport to alter that aspect of the exclusionary rule which applies to warrants that are facially deficient warrants *ab initio*." (footnote omitted)).

As a final matter, finding good faith on the part of Perry and Nash does not necessarily require affirmance, as remand may be appropriate where the district court failed to "consider the actions of all the police officers involved." *Master*, 614 F.3d at 243 (quoting *Herring*, 129 S. Ct. at 699). Here, however, the district court independently assessed the culpability of each officer relevant to this inquiry, and it found their actions to be at most negligent—a conclusion with which we agree. That fact distinguishes this case from *Master* and establishes that no remand for clarification is necessary. *See id.*

### III.

For the foregoing reasons, we **AFFIRM** the district court's denial of Godfrey's motion to suppress.